**In re Byron Jon GREIMAN, Connie Sue Greiman, Debtors.**

**Bankruptcy No. 84–05015.**
**Contested No. 699.**

United States Bankruptcy Court,
N.D. Iowa.

Dec. 19, 1984.

Memorandum of Decision Jan. 9, 1985.

*Findings of Fact, Conclusions of Law and ORDER Granting Motion for Lifting of Stay*

WILLIAM W. THINNES, Bankruptcy Judge.

The matter before the Court involves a request by John Hancock Mutual Life Insurance Company for relief from the automatic stay or alternatively adequate protection of its interest in Missouri farmland owned and operated by the Debtors-in-Possession (Debtors). Evidentiary hearings on Hancock's motion were held on September 4, 1984, and October 30, 1984. The parties requested and were granted permission to brief the issues. Having reviewed their briefs and the evidence adduced at both hearings, the Court, pursuant to F.R.B.P. 7052, makes the following Findings of Fact, Conclusions of Law and Orders.

## BACKGROUND FACTS

Since approximately 1975, the Debtors had been involved in two farming operations, one located in Hancock County, Iowa, and the other in Harrison and Mercer counties in Missouri. The Missouri farmland is approximately 200 miles from their Iowa operation where Debtors reside. Prior to their acquisition of this property, favorable commodities prices allowed the Debtors to make substantial profits from their Iowa grain farming operation. Nonetheless, Mr. Greiman, who has an undergraduate degree in Animal Science, a Masters in Animal Nutrition and a Doctorate in Animal Breeding, was interested in establishing a livestock operation. This interest coupled with personal health concerns prompted the Debtors to purchase the Missouri farm for use as a livestock operation. The property, consisting primarily of rolling pastureland with an abundant, accessible water supply and good physical improvements was particularly well suited for Debtors' intended purpose. Unfortunately, the cattle market turned sour as did commodities prices while interest rates skyrocketed. The resulting financial pressure caused the Greimans to seek a refinancing loan from John Hancock in September of 1980. Because Missouri

R. Fred Dumbaugh and Dan Childers, Cedar Rapids, Iowa, for debtors.

Linda Kniep, Des Moines, Iowa, for movant.

suffered a drought during the 1980 crop year and winter feed was in short supply, Debtors sold off much of their herd that winter and began converting their Missouri operation to a row crop farm. Since 1981, Debtor has continually brought more and more acres into production by working and planting the upland rolling pastures. By 1984, some 991 acres were being row cropped with 91 acres planted in corn and 900 acres in soybeans.

## FINDINGS OF FACT

1. The Debtors, Byron and Connie Greiman, filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on February 8, 1984.

2. At the time of filing, the outstanding principal and interest on Debtors' loan from Hancock was approximately $1,000,000. Their current delinquent indebtedness stands at a little more than $125,000. No payments have been made by Debtors since sometime in 1983. Hancock's loan was secured by a deed of trust executed by Debtors in 1980 and properly recorded in the Harrison and Mercer County recorders' offices. This document covers the entire Missouri property which consists of 1734.5 acres [1] located in the two counties. When this financing transaction was consummated, Debtors valued the Missouri farm at $1,706,200 and were using the land primarily for their livestock operation.

3. The debt against the property far exceeds its value. Credible testimony elicited from Hancock's outside appraiser placed the current fair market value of the farm at $310 per acre or $537,795.00. Debtors' appraiser who did not visit the farm but merely studied Hancock's appraisal agreed this figure was within the ball park.

4. The Missouri farm like most agricultural real estate has suffered a substantial decline in value in the last two years.[2] A 1983 Iowa land survey revealed that values in Decatur County, which is only two miles north of Debtors' property, declined 17 percent in 1983.[3] While Debtors do not seriously dispute a past diminution in value, they hotly contest the future trend of the land market generally and this property in particular. Nonetheless, credible testimony by Hancock's appraiser established that if market conditions remain the same, that is, high interest rates and depressed commodities prices and livestock prices, property values will probably continue to decline. He also opined that marginal farmland like the Debtors will suffer a greater decline, a fact substantiated by the Iowa land survey which revealed that on the average low-grade Iowa farmland declined by 7 percent while high-grade land fell 6.3 percent and medium-grade land decreased 5.8 percent in value.

5. The Missouri property is subject to a further value decline from two other sources. Due to the topography of the land, the highest and best use of this property is for a livestock operation. Although the evidence established that only 400 acres should be row cropped on a rotational basis, Debtors have consistently intensified their use of the property so that by the past crop year 900 acres of land was dedicated to beans and 91 acres to corn. Much of the land Debtors have brought into production has been in the upland pasture

1. There seems to be a conflict between the parties as to the exact acreage. Debtors maintain this farm consists of 1796 acres while Hancock believes the total acreage is 1700.5. The court has relied on Hancock's independent appraiser's report for its figure since this total was taken from the Harrison and Mercer County records.

2. The parties own estimates of value in varying contexts are illustrative of this diminution in value. For instance, despite the high value Debtor placed on the property in 1980 and again in 1983 when he was in default, he listed the property as worth $449,000 in his bankruptcy schedules in February of 1984, and his Plan of Reorganization filed in September of 1984 contemplates paying Hancock $490,000 for the property. Conversely, re-valuation summaries prepared by a Hancock employee valued the property at $827,660 in January of 1984 and $703,000 in March of the same year.

3. This steeper decline was apparently related to the fact that for the fourth consecutive year, this area suffered from adverse weather conditions which greatly reduced crop yields.

portion which contains slopes up to 20 percent. And while they have been using a no-till method to row crop the uplands, the rows are planted straight up and down the hills rather than on the contour because the slopes are too steep for machinery to move horizontally across the land.[4] As a result, the upland portion has been subject to erosion, a process that is likely to be exacerbated if the land is row cropped in the future as Debtor proposes. Essentially then, Debtors current and intended future use of the land is wasting the asset and diminishing its value. As the topsoil is depleted, the productivity of the land will continue to decline.[5]

6. Additionally, there is a potential for a decline in value due to a deterioration of the improvements. Because the highest and best use of the property is a livestock operation, the physical condition of the farm buildings is crucial to its overall value. Since Debtors have abandoned their livestock operation, they have little incentive to keep the buildings in top repair.[6] Moreover, testimony adduced at the hearing revealed that the start up costs are significantly enhanced when buildings and equipment are not being used. The house and a couple of buildings presently need substantial repairs while others are in need of some minor maintenance. In sum, the Court concludes the past and future potential for erosion as well as the likely deterioration of the physical improvements seriously jeopardizes the value of Hancock's collateral.

7. Except in 1981 when debtors sold a substantial portion of their livestock herd, the Debtors have continually lost money on their combined Missouri-Iowa farm operation. The following figures taken from Debtors' income tax statements are illustrative:

Net Farm Income (Losses)

| 1980 | 1981 | 1982 | 1983 |
|---|---|---|---|
| ($140,521.71) | $19,717.00 | ($307,772.45) | ($30,158.87) |

Even adding back depreciation expense which can artificially reduce farm income, Debtors' earnings still do not yield a positive income.[7]

| 1980 | 1981 | 1982 | 1983 |
|---|---|---|---|
| ($ 78,642.85) | $49,155.44 | ($280,558.45) | ($ 5,579.39) |

8. Debtors' income picture for 1984 does not look much better at least with regard to the Missouri property.[8] When

---

4. Hancock's appraiser, an individual with extensive experience as a farm manager, opined that no-till in vertical rows is not really a conservation practice but rather approaches a straight farming method in terms of expected erosion. He further ventured that soybeans are the worst crop in terms of erosion damage since they are a legume which tends to loosen the top soil making the land more vulnerable to sheet erosion in the advent of heavy rains. Debtors response to this evidence was two witnesses who claimed Debtors' farming practices were similar to those of other farmers in the area and the erosion on Debtors' farm was about the same as neighboring farms. Debtor also claimed he undertook certain conservation measures on the property such as shoring up gullies and ditches, however, the court notes that although the income tax forms provide a line for conservation expenses, there are no such entries in Debtors' 1980, 1981, 1982 or 1983 returns.

5. This conclusion was substantiated by the appraiser's report and his testimony which established no yields could be expected from soybeans or corn on Gara soils with 9 to 20 percent, the kind of land which comprises much of Debtors' Missouri property. The appraiser's opinion was substantiated by the Soil Interpretation Record published by the Soil Conservation Service which indicated that no expected yield from soybeans or corn on Gara soils with a slope of more than 14 percent or even on this soil with a slope of 9–14 percent if the land was severely eroded.

6. Although Debtors list substantial repair expense for the 1980–1983 tax years, it is difficult to tell whether those expenditures were for building maintenance and repairs or merely machinery and equipment. Additionally, if the expenditures were for buildings, the Court is unable to tell whether they were for the Missouri improvements since the tax returns cover their combined operations. Whatever the case, in 1984 Debtors only expended $1,000 for building maintenance and have budgeted the same amount for building expense in 1985.

7. Some of these figures may not be exact because the copies of income tax forms received by the Court are not of the best quality. However, the figures are a very close approximation.

8. Debtors cash rented the Iowa farm in 1984 concentrating all their farming efforts on the

the Debtors filed their Plan of Reorganization and Disclosure Statement on September 14, 1984, they projected the Missouri operation would yield a net farm income of $54,592. At the October 30th hearing, Debtor revealed the beans were too poor to harvest and the only income from the Missouri acreage would come from his federal crop insurance. Comparing Debtors' 1984 projections with their revised estimates provides the Court with yet another poignant example of Debtors' overly optimistic outlook on the Missouri farm's productive capabilities.

| | 1984 Projections | Revised Estimates |
|---|---|---|
| Gross income | $199,564 | $115,000 |
| Expenses | 144,972 | 144,972 |
| Net Income | $ 54,592 | ($29,972) |

Unlike the other years when Debtors were making substantial debt service payments, in 1984, they had complete protection from such interest expenses and still could not show any gain from their Missouri operation.[9]

9. The Court also concludes Debtors' Cash Flow Projections for 1985 are too unrealistic. In particular, they estimate gross income from crops sales to be $378,795. The breakdown of this income is as follows:

| | Acres | Yield | Price | Total |
|---|---|---|---|---|
| Corn | 541 | 115 Bu/A | $3.00/Bu | $186,645 |
| Beans | 915 | 30 Bu/A | $7.00/Bu. | 192,150 |

Since Debtors' Iowa operation consists of 440 acres they must contemplate row cropping a good deal of the Missouri acreage (1456—440 = 1016). Yet substantial testimonial and documentary evidence introduced by the movant established that only a little over 400 acres of the Missouri farmland is suitable for rotational row cropping. In light of this fact, Debtors' projections of rather substantial yields from the remaining 616 acres of Missouri farmland strikes the Court as wishful thinking. Moreover,

crop sales figures from previous years do not support Debtors' optimistic projections. Absent crop insurance this year, Debtors' losses from their Missouri operation would have been even more overwhelming than they have been. And while Debtors claim they have not experienced a normal year since they began row cropping, evidence indicates that the steep slopes and erosion problems will likely decrease the future productivity of this land.[10] In sum, the Court concludes the Missouri farm as it is presently being operated and as Debtors propose to operate it will undoubtedly be a drain on their farm operations as a whole, rather than an enhancement to Debtors' income.

10. Debtors conditionally offered to give Hancock a lien in their 1985 Missouri crop second only to their input suppliers if this Court found the Movant was not adequately protected.

## CONCLUSIONS OF LAW

Based on the foregoing facts and the inferences therefrom, the Court concludes:

1. Hancock has sustained its burden under 11 U.S.C. § 362(g)(1) of proving Debtors have no equity in the property.

2. Conversely, Debtors have not carried their burden of proving the Missouri property is necessary for an effective reorganization. 11 U.S.C. § 362(g)(2). Therefore, the stay must be vacated pursuant to 11 U.S.C. § 362(d)(2).

3. Additionally, the Debtors have failed to offer adequate protection of Hancock's interest in the property because:

(a) more likely than not, the value of the property will continue to decline in the foreseeable future;

Missouri operation. These income figures do not include $45,675 Debtors received in cash rent for the Iowa farm.

9. According to their tax returns, debt servicing expenses were $181,536.34 in 1980, $167,665.10 in 1981, $224,139.83 in 1982, and $189,730.15 in 1983. The Court also notes, based on Debtors

proposed Plan of Reorganization valuing the property at $490,000 at annual interest rate of 10 percent, that Debtors' debt services costs would have been $49,000 increasing their 1984 loss to almost $79,000.

10. See footnote 5, *supra.*

(b) the Debtors' current farming practices are wasting the asset;

(c) nonuse of the property for a livestock operation will increase the startup costs in converting the property to its highest and best use and lacking an incentive to repair, the condition of the outbuildings will probably continue to deteriorate;

(d) given the past production of this land, a lien in the 1985 crop is an iffy proposition at best and, in any event, would not protect Hancock against the erosion of its asset.

4. In the absence of a showing of adequate protection, the Court is duty bound to lift the stay. 11 U.S.C. § 362(d)(1).

### ORDER

IT IS HEREBY ORDERED that the automatic stay provided by 11 U.S.C. § 362(a) should and is lifted pursuant to 11 U.S.C. § 362(d)(1) and (2).

PURSUANT to F.R.B.P. 7052, a Memorandum of Decision will be issued at a later time.

### MEMORANDUM OF DECISION

In view of the evidence adduced at the hearings, there are essentially three issues presented for decision. Specifically, the Court must decide: (1) whether the farming practices employed by Debtors are impairing the value of the Missouri property; (2) whether the value of the land has and will continue to decline by reason of the agricultural climate and market conditions; and (3) whether the farm as it is currently being utilized is sufficient to carry its own weight or make any contribution to an effective reorganization. The first two issues deal with adequate protection while the latter focuses on whether the Missouri property is necessary for an effective reorganization.

There are two statutory grounds for lifting the stay. 11 U.S.C. § 362(d)(1) and (d)(2). The test under § 362(d)(2) is conjunctive; thus the stay cannot be lifted

pursuant to this section unless both conditions are satisfied, that is, unless debtor has no equity in the property and it is not necessary for an effective reorganization. Even if a debtor avoids a vacation of the stay under this section, it can nonetheless be lifted under § 362(d)(1) if a creditor's interest in the property is not adequately protected.

■ By statute the task of justifying a continuation of the stay is allocated principally to the Debtors. They must shoulder the burden on the question of adequate protection and all other stay issues except their equity in the property, proof of which is the bailiwick of the creditor. 11 U.S.C. § 362(g). The charge on Debtors includes not only the task of going forward but also the ultimate burden of persuasion.

■ A moving creditor seeking relief from the stay, in addition to carrying the ultimate burden of proof with respect to equity, must establish the validity and perfection of its security interest and the amount of its debt along with any other allowable costs secured by its claim. *In re Irving A. Horns Farms Inc.*, 42 B.R. 832, 836 (Bkrtcy.N.D.Iowa 1984). Hancock has met its burden in this regard since its deed of trust was properly recorded and the amount of the indebtedness far exceeds the value of the property. Hence, the remaining issue relevant to a lifting of the stay pursuant to section 362(d)(2) is whether the property is necessary to effective reorganization.

### I. *Necessary for an Effective Reorganization*

Generally, courts considering this issue have required more than a bare assertion by Debtors that the property is necessary for their survival and their hope of reorganization. In the main, the majority have required a showing by debtors that there is a reasonable possibility of a successful reorganization within a reasonable time. *In re Development, Inc.*, 36 B.R. 998, 1005 (Bkrtcy.Hawaii 1984); *La Jolla Mortgage Fund v. Rancho El Cajon Associates*, 18 B.R. 283, 291 (Bkrtcy.Cal.1982); *In re*

*Clark Technical Associates, Ltd.,* 9 B.R. 738, 740 (Bkrtcy.Conn.1981); *In re Hutton-Johnson Co., Inc.,* 6 B.R. 855, 860, (Bkrtcy. S.D.N.Y.1980); *In the Matter of Terra Mar Associates,* 3 B.R. 462, 466, (Bkrtcy. Conn.1980). Armed with this standard, courts have frequently scuttled property even in single asset cases because debtor's reorganization efforts were not congruent with the hard economic realities of their current and prospective financial position. *See, e.g., In re Amarex, Inc.,* 30 B.R. 763, 767 (Bkrtcy.Okla.1983) (words "necessary for an effective reorganization" for purposes of denial of relief from automatic means essential to an effective reorganization and not merely that it would be useful or helpful and such fact must be ascertainable at the time of consideration of a continuation of stay and a clear showing must be made); *Gem Savings Association v. Oak Manor Home, Inc.,* 17 B.R. 84, 86 (Bkrtcy.Ohio 1981) (A vacation of the stay is appropriate where the potential for reorganization is slight other than a proverbial boot-strap operation at the expense of third party risks); *In re Mikole Developers, Inc.,* 14 B.R. 524, 526–27 (Bkrtcy.Penn.1981) (The mere fact the property is indispensable to debtor's survival is not enough and debtor's high hopes for reorganization or need for the property is not the *sine qua non* under § 362(d)(2) particularly where, as here, debtor's present operations are not profitable and are unlikely to be so in the next several months); *Matter of Sundale Associates, Ltd.,* 11 B.R. 978, 981 (Bkrtcy. Fla.1981) (Debtor's manifest failure to discharge the statutory burden of proving the property is necessary for an effective reorganization in light of the absence of testimonial or documentary evidence supporting the likelihood of the proposed sale cause this court to conclude the creditor is entitled to a vacation of the stay).

Conversely, at least one court has rejected a possibility or feasibility test as the appropriate standard under section 362(d)(2) in favor of one based on need. *In re Koopmans,* 22 B.R. 395 (Bkrtcy.Utah 1982). Under this narrower test, property is necessary for an effective reorganization "whenever it is necessary, either in the operation of the business or in a plan to further the interests of estate through rehabilitation or liquidation." *Id.,* 22 B.R. at 407. *See also, In re Keller,* 45 B.R. 469 at 471–472 (Bkrtcy.N.D.Iowa 1984).

While the court would not foreclose the possibility that the feasibility of reorganization would never be a determining factor in stay litigation, the primary thrust should not be a global inquiry into a debtor's financial prospects but the nexus between a specific property and the part it is likely to play in a reorganization effort. Basically the focus should be on whether the property in question can make an identifiable contribution to a debtor's reorganization, be it a liquidation or a rehabilitation. In line with this more limited focus, property may be necessary if it generates income that will benefit the estate or if it enhances the sale value of the business as a going concern.

Ascertaining the appropriate legal standard does not in any meaningful way address the kind of factual showing a debtor must make to sustain his burden under section 362(d)(2)(B). If a reorganization is in its infancy, a lesser showing may be sufficient. At this stage, it would be unreasonable to expect a debtor to produce hard evidence of profitability or potential sale value when the debtor has not had an opportunity to evaluate all the options that may result in a financial turnaround. *See e.g., In re W.S. Sheppley Co.,* 45 B.R. 473 (Bkrtcy.N.D.Iowa 1984). Even further along the road, testimony by the debtor concerning the need of the property for an effective reorganization coupled with the peculiar facts and circumstances of a case may be sufficient to hold a creditor at bay under section 362(d)(2). *See e.g., Keller,* at 472. On the other hand, when the available evidence casts substantial doubt on a debtor's assertions that the property is necessary to his reorganization efforts, debtor's burden be-

comes more difficult. Such is the case at bar.

Assessing the evidence in stay litigation is an inexact science at best. So much depends on future trends, especially in the agricultural sector, where interest rates, commodity prices, the weather, government programs and a myriad of other factors have a large and sometimes crushing impact on a farmer's financial health. Nonetheless, courts frequently are called upon to practice this inexact science and to assess the meaning of past and future trends. To that end, the Court notes that Debtors' immediate past financial experience with this property belies their assertion that the Missouri farm is necessary for an effective reorganization. Indeed, the available evidence compels a conclusion that this property has and will continue to be a financial drain on their farming operations.

For the past four years, Debtors' combined Missouri-Iowa operations have resulted in substantial losses except in 1981 when Debtors sold almost $140,000 worth of livestock. This pattern continued in 1984 when their earlier projections of net income from the Missouri property were thwarted by almost a total failure of their soybean crop turning a projected profit of $54,592 into a $29,972 loss.[11] Only federal crop insurance saved Debtors from more overwhelming and devasting losses on their Missouri operation in 1984. And while Debtors point to several unfortunate circumstances to explain their recent income history, the fact remains that the current and intended use of the property has never generated positive income, not even in 1984 when they enjoyed complete protection from the huge debt service expenses they incurred in prior years. If Debtors had been required to pay interest at the 10 percent rate proposed in their plan, their losses for 1984 would jump to almost $79,000.

Debtors nevertheless contend this property, even under adverse conditions, can make a substantial contribution to their reorganization efforts. Absent considerable evidence by movant that much of the Missouri property is not suitable for row cropping, the Court might concur in Debtors' optimism that this property can generate sufficient income to service the debt on Hancock's secured claim and provide a source of revenue for other classes of their creditors. When, however, Debtors' optimistic projections for 1985 are considered in the context of the land's unsuitability for row cropping and its past performance, this Court can only conclude that the property will, more likely than not, make little or no contribution to Debtors' reorganization efforts. Indeed, since the property is located over 200 miles from Debtors' primary operation, the expenses of commuting and, or keeping two sets of equipment could entail additional costs that will involve a drain on Debtors' resources particularly if they reap little income from the property. In that regard, the Court notes Debtor Byron Greiman and his 15-year-old son intend to crop farm 1456 acres by themselves and while this is not an impossible undertaking, the 200-mile commute makes the task more expensive and arduous not only in dollars and cents but also in time and energy.

In sum, the Court concludes the Debtors have failed to sustain their burden of proof and persuasion on the reorganization issue since the available evidence rather than supporting their position tends to compel the opposite conclusion. Accordingly, Hancock is entitled to a vacation of stay under section 362(d)(2).

## II. *Adequate Protection*

Hancock is also entitled to relief from the stay under 11 U.S.C. § 362(d)(1) because Debtors have not carried their burden of proof or persuasion on the issue of

---

11. Because Debtors cash rented their Iowa farm in 1984, the Court attributed all operating expenses incurred by Debtors to their Missouri operation. This expense allocation accords with that of the Debtors in their 1984 cash flow projections which was attached to their Disclosure Statement. In order to be perfectly fair with Debtors, perhaps one-half of the living expenses should be attributed to their Iowa farm which still leaves a loss of $16,733.

adequate protection. As this Court recently observed:

> "Adequate protection" as bearing upon the automatic stay contemplates protecting the secured creditor from "decreases in the value of such entity's interest" in the collateral due to the imposition of the stay; in the context of the automatic stay, Congress believed the existence *vel non* of such a decline to be almost decisive in determining the need for adequate protection.

*In re Borchers*, 45 B.R. 69 at 72 citing *In re Saypol*, 31 B.R. 796, 800 (Bkrtcy.N.Y.1983).

In the case at bar, Hancock presented weighty evidence that the value of its collateral was jeopardized in several respects; first, Debtors' current and intended farming practices are creating a serious erosion problem; second, land prices have and will continue to decline given the current agricultural climate and market conditions; and third, the physical improvements are likely to deteriorate in view of Debtors' nonuse and a lack of incentive for Debtors to repair them or maintain their condition.

Not surprisingly, Debtors hotly dispute the existence of an erosion problem or the likelihood of a value decline by reason of the current and future market trends. In the face of substantial evidence undermining their position, Debtors throw up several lines of defense. Although the Court does not wish to unduly prolong this opinion, a couple of their contentions deserve further comment.

■ In the first instance, Debtors argue that even assuming an erosion problem exists, Hancock has not established the erosion is contributing to a value decline, nor made any record regarding the amount of the decline. As to the first part of their argument, two witnesses testified the erosion would diminish the value of the property. Even Debtors' appraiser, who had not visited the property and thus could not evaluate the degree of erosion, admitted that severe erosion would affect the value of the property. The remainder of Debtors' argument concerning Hancock's failure to establish the amount of the decline overlooks the placement of the burden of proof and persuasion. Once the likelihood of a diminution in value has been credibly raised, a prima facie case for lifting the stay for lack of adequate protection has been made until and unless Debtors effectively negate this showing by competent evidence. *See, In re Borchers*, 45 B.R. 69, 72 (Bkrtcy. N.D.Iowa 1984).

■ As is apparent from the Court's findings, the better evidence established that Hancock's interest in the property was subject to a diminution in value from three separate sources. Even though the evidence did not pinpoint the percentage of the expected decline, the Court concludes that the cumulative detrimental effect on Hancock's interest cannot be characterized as *de minimis*.[12]

As their second line of defense, Debtors contend proof of declining value is rendered nugatory by Hancock's admission that it intends to retain the property even if it gains possession. In other words, Debtors argue that Hancock's position that it is being harmed by a value decline is disingenuous because it does not intend to protect itself against that eventuality if this Court should vacate the stay.[13] Once again

---

**12.** Thus, this case is distinguishable from *In re W.S. Sheppley Co.*, 45 B.R. 473 (Bkrtcy.N.D.Iowa 1984) where the Court held that although the second mortgagee's security position was being eroded because of accruing interest to the prior secured creditor, the mortgagee was not entitled to relief from the stay given the infancy of debtor's reorganization efforts and the fact that the shortfall was de minimis when compared to the value of building and the amount of the debt.

**13.** As a corollary to this argument, Debtors note that if Hancock regains possession and devotes it to its highest and best use, a conservative utilization of the property will only produce approximately $7,000 in yearly income whereas under Debtors' Plan Hancock would receive $51,918.83. The Court concludes Debtors erroneously relied on one of the movant's exhibits which projected Debtors income from their row cropping operation in 1984. This estimate of $7,000 income proved optimistic in light of the

the Debtors are laboring under a misapprehension.

 A creditor does not have any duty to explain what it intends to do with the collateral if it is successful in vacating the stay. The mere fact a secured claimant would do nothing more than Debtor with the property does not mean debtor should be allowed to keep the property. *In re BBT*, 11 B.R. 224, 230 (Bkrtcy.Nev.1981).

Secondly and perhaps more to the point, Debtors' argument does not speak to the value decline attributable to the erosion problems. Although credible evidence indicated that present farming practices are dissipating the topsoil, Debtors still intend to continue row cropping the farm. Consequently, were Hancock to regain possession of the property, it could take whatever steps were necessary to prevent further erosion. By virtue of obtaining control over the property, Hancock would have an opportunity to mitigate future losses from Debtors' erosive farming methods. Indeed, a Hancock employee testified that their first priority would be to reseed the hills.

Because the evidence conclusively establishes the need for adequate protection, the Court now turns to a consideration of Debtors' claims concerning adequate protection of Hancock's interest in the property.

First, Debtors claim their Plan of Reorganization which is currently on file would protect Hancock against any decline in value that conceivably would occur. Debtors' proposed plan values Hancock's secured claim at $490,000 and contemplates paying that amount over 30 years at an annual interest rate of 10 percent in equal yearly installments of $51,978.83. Additionally, they intend to pay interest on the movant's claim from the date of confirmation through December 31, 1984. Altogether then, Debtors contend these payments would exceed $60,000 and Hancock would be protected against a 10 percent value

decline in the Missouri property during the first year.

The Court concludes Debtors' Proposed Plan does not constitute adequate protection of Hancock's interest in the property for two reasons. The 1984 interest payment will not materialize since it stands no chance of confirmation until early 1985. Additionally, the yearly payments are to be made on or before December 31 of each year. As a consequence, Hancock will probably not receive any payment at all until December of 1985. The prospect of a payment twelve months hence does not adequately protect Hancock against the current value decline particularly in light of Debtors' past earnings record with this property nor does it address the longterm effect on values that are likely to result from Debtors' erosive farming practices.

Debtors' income picture since they began grain farming the Missouri operation is bleak. Even in 1984 when they enjoyed complete protection from debt service expenses, Debtors lost money on their Missouri operation. In view of these historical losses, the burden was on Debtors to show that their Missouri operation could be profitable. Absent some evidence of changes in factors responsible for the losses experienced in the Missouri operation, the Court has no basis to accept Debtors' bold and unpersuasive statements that even minimal payments to Hancock can be made. Stated otherwise, Debtors cannot rely on their Plan to provide adequate protection without some competent proof their prior losses will be obviated in the future. *See, e.g., In re Binning*, 24 B.R. 328, 330 (Bkrtcy.Ohio 1982) (Secured creditor entitled to relief from automatic stay to proceed with foreclosure action where farmer-debtor's unconfirmed Chapter 11 plan did not provide adequate protection since no explanation was provided as to why projected future profitability was expected when actual recent history of debtors had been otherwise).

The second shortcoming in Debtors' reliance on their plan to provide adequate

failure of their soybean crop. Under an income approach, Hancock's appraiser projected that an

annual net income of $31,699.46 could be realized by devoting the property to its proper use.

protection is even more fundamental. Although they contend payment under the plan will protect Hancock against a 10 percent decline in the value of the property, this Court determines otherwise. Specifically, Debtors cannot rely on the interest portion of their plan payment to provide adequate protection since it does not reach or reduce the amount of Hancock's secured claim. Debtors propose making equal yearly installments to Hancock of $51,798.83 for a period of 30 years. Since $49,000 of their first annual payment constitutes interest, Debtors would be paying $2,978.83 in principal on Hancock's $490,000 secured claim. A principal payment of this amount would only protect against 0.6% decline in value in the first year. Yet the evidence clearly established the decline would be much greater. Hancock's appraiser valued the property as of February 8, 1984, and did not take into account the effects on market value of yet another disastrous crop year. Given the drought in the area, the drop in value by reasons of market conditions will far exceed 0.6% protection afforded by Debtors' plan. In short, payment under Debtors' plan does not afford adequate protection of Hancock's interest in the property.

At the end of the final hearing, Debtors offered Hancock a lien on their 1985 crop, second only to their input suppliers, to secure Hancock for any actual decline in value if the court found a lack of adequate protection. They contend this offer constitutes adequate protection because even if the crop fails next year they have established that expected earnings from the Missouri farm can be protected by crop insurance. At the risk of sounding redundant, a replacement lien in the 1985 crop, in light of the unsuitability of the property for grain farming and the land's past performance, is an iffy proposition at best. As for the crop insurance argument, the Debtors have offered no proof on the continued availability to them of this kind of insurance or its costs. Even if crop insurance is available, it is not sufficient to adequately protect movant's interest.

Accepting Debtors' figures at face value the expected return on crop insurance would be $115,000 minus cost inputs of $56,000 and a premium payment of $15,000 or $44,000 total. It is unclear from Debtors' argument whether the $44,000 protection offered by the replacement lien is in addition to the payment under the Plan. Assuming first that it is, it is clear that the federal crop insurance would not adequately protect Hancock's interest because there would be no monies from the Missouri operation to fund the 1985 payment to Hancock if the insurance proceeds are used to compensate Hancock for the decline in value. If the replacement lien is construed only as guaranteeing payment under the Plan, then the $44,000 is not adequate protection because it would not meet even Debtors' 1985 interest obligations of $49,000. As noted earlier, only payments on the principal amount of secured creditors' claim can be used in evaluating the likelihood of adequate protection.

In sum, the Court concludes that neither Debtors' proposed Plan of Reorganization nor their offer of replacement lien constitutes adequate protection of Hancock's interest in the property. In the absence of a showing of adequate protection of its interest, Hancock is entitled to a vacation of stay under section 362(d)(1).