In re NEW AMERICAN FOOD CONCEPTS, INC., Debtor.

Bankruptcy No. B86–3203.

United States Bankruptcy Court, N.D. Ohio, E.D.

Jan. 20, 1987.

National Conference of Bankruptcy Judges held in October 1986 at Nashville, Tennessee.

Joseph C. Domiano, Sindell, Rubenstein, Einbund, Pavlik & Novak, Cleveland, Ohio, for debtor, debtor-in-possession.

Dale H. Powers, and Ralph Sobieski, Berea, Ohio, for Needles Development Company.

## MEMORANDUM OF OPINION AND ORDER

RANDOLPH BAXTER, Bankruptcy Judge.

This matter is before the Court upon the motion of Needles Development Company (Needles) for relief from the automatic stay or, alternatively, for adequate protection pursuant to 11 U.S.C. § 362(d). The matter was heard to the Court with notice having been made upon all parties entitled thereto. Upon an examination of the record in its entirety, the evidence adduced, and arguments of counsel, the following constitutes the findings of this Court pursuant to Rule 7052, Bankr.Rules:

### I.

The Debtor, New American Food Concepts, Inc. (Debtor), a bar and restaurant business located in Rocky River, Ohio, caused to be filed its petition under Chapter 11, on October 14, 1986, and has continued in such operation pursuant to § 1108 of the Code. In July of 1983, Needles sold to Debtor a bar and restaurant business which involved all assets, excluding any

cash and/or accounts receivable, for an amount of $200,000.00. The purchase agreement required an $85,000.00 down-payment and a $115,000.00 balance at 12% interest evidenced by a promissory note which was secured by a U.C.C. security interest in all of the assets purchased by the Debtor. The terms of the note provided, *inter alia*, that the Debtor would pay $2,500.00 monthly beginning February 1, 1984, through July 31, 1986. Then, in August of 1986, the Debtor would pay the balance of the debt together with all accrued interest. (See Needles' Exhibit Numbers 8, 9 and 10). The necessary financing statements in the assets were duly filed. (Needles' Exhibit Numbers 11 and 12). On August 1, 1986, the Debtor defaulted on the terms of the note and has made no subsequent payments thereon, while continuing to remain in possession and use of the secured assets.

Prepetition, on September 17, 1986, Needles obtained a cognovit state court judgment on the note in the amount of $77,-340.01, representing a balance then due and owing on the note, at an interest rate of 12%, plus costs. Subsequently, on September 25, 1986, Needles initiated garnishment proceedings in a state court action for monies held in the Debtor's bank account. Additionally, Needles commenced a replevin action in state court proceedings to obtain possession of its secured assets. On the date the replevin action was to be preliminarily heard in the state court, the Debtor caused to be filed its petition under Chapter 11. This motion of Needles ensued.

## II.

*Applicable Law:*

§ 361: Adequate Protection:

When adequate protection is required under section 362, 363, or 364 of this title ... of an interest of an entity in property, such adequate protection may be provided by—

(1) Requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title —use, sale, or lease under section 363 of this title—or any grant of a lien under section 364 of this title—results in a decrease in the value of such entity's interest in such property;

(2) Providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) Granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title—as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property. (11 U.S.C. § 361).

§ 362(d): On request of a party in interest and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest, or

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization. (11 U.S.C. § 362(d)).

362(g): In any hearing under (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section—

(1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and

(2) the party opposing such relief has the burden of proof on all other issues.

## III.

In seeking relief from the stay, Needles contends, *inter alia*, that the Debtor's as-

sets are approximately equal to the indebtedness owed by the Debtor to Needles and that the collateral thereon is continually depreciating by the Debtor's continued use thereof. Further, Needles contends that the Debtor has no equity interest in the secured assets and the assets are not necessary to an effective reorganization of the Debtor. Alternatively, Needles avers that it has not been provided with adequate protection for its secured interest.

Contrary to these assertions of Needles the Debtor denies that the value of its assets secured by an indebtedness to Movant is approximately equal to the indebtedness. Debtor contends that its debt schedules filed with the Court require amendment, which, once amended, will reflect the Debtor's possession of equity in the assets. Alternatively, the Debtor contends that should the Court determine it lacks equity in the assets, Debtor has proposed to provide what it believes constitutes adequate protection for Needles' secured interest.

### IV.

In reaching a resolution of this matter, it is necessary to address the alternative elements of § 362(d). That is, a determination must be made to see if cause exists to grant relief from the stay or, alternatively, whether the Debtor has an equity interest in the subject assets and whether such assets are necessary for an effective reorganization of the Debtor's business. Pursuant to § 362(g), the party requesting relief from the stay has the burden of proof concerning the Debtor's equity in the property. On all other issues, the party opposing such relief has the burden of proof. Since the gravamen of Needles' argument is a lack of equity by Debtor, and Needles bears the burden of proof thereon, that issue will be examined first. In so doing, the financial history of Debtor is relevant.

At the evidentiary hearing on this matter, Needle's Exhibits Numbered 22, 23 and 24, comprising the Debtor's financial statements for the years of 1984, 1985 and 1986, reflect that the Debtor received loans from certain of its shareholders which totalled $99,400.00.[1] These same financial statements revealed operating losses sustained by the Debtor for each of those years, totalling $196,489.00. Of further significance, Debtor received loans from the Huntington National Bank (Bank) at various times since 1984 against a $100,000.00 unsecured line of credit, which was collateralized by certain bonds owned by one of the Debtor's principals. Upon a sale of those bonds, the Bank applied proceeds of $49,873.00 to the Debtor's outstanding loan balance, leaving an approximate balance of $33,970.00. The Bank presently holds $17,770.00 of the Debtor's funds.

Also not reflected on the Debtor's original Schedules filed with the Court are the total delinquent lease obligations pertaining to its principal business location. The Debtor is in a default status on its lease. Such lease was assigned to it consequent with Debtor's acquisition of the restaurant business from Needles. Although the precise arrearages are not certain from the evidence adduced, it is clear that the formula utilized to determine the rental payments shows a deficiency, which has not been reflected on the Debtor's Schedules.

### V.

As indicated above, there are two bases for termination of the automatic stay provided for under § 362(d) of the Code. The first allows relief from the stay premised on a sufficiently demonstrated "cause," while the other ground grants such relief where the Debtor lacks equity in the subject property and such property is not necessary to an effective reorganization of the debtor. In litigation concerning the automatic stay, the Code generally seeks to leave matters in a status quo posture, especially in business cases, to provide a reasonable opportunity for a financially distressed debtor, its creditors,

---

1. This indebtedness was reflected on Debtor's amended Schedules, but not on its original Schedules filed with the Court.

and the Court to determine whether there are reasonable prospects for the debtor's survival. *In Re American Mariner*, 27 B.R. 1004, 1014; *rev'd on other grounds*, 734 F.2d 426 (9th Cir.1984). This underlying policy evokes a balancing of the equities which entails supporting a debtor's rehabilitation versus the protection of a creditor's interest in assets of the estate. Also, at the instance of a bankruptcy filing, the relationship between secured creditors and a debtor is transformed by the intervention of two major factors: (1) the bankruptcy estate acquiring an interest in the collateral and, as a party in interest, being entitled to be heard. To effect such hearing, the debtor in possession necessarily requires reasonable time to evaluate its posture; and (2) secondly, in a Chapter 11 case, the debtor in formulating its plan for presentment to the Court, may require use of the collateral which would assist in bringing arrearages current, as well as a means of insuring against future defaults. Concomitantly, neither of these intervening factors should alter the relative positions of the debtor and a secured party. *American Mariner, supra,* at 1009. To the extent that a creditor's rights are subject to modification, the Court must determine whether the debtor has any reasonable likelihood of rehabilitation to merit the temporary reprieve afforded by the Code. The stay should only be lifted when such does not frustrate the purpose of the stay when it is necessary to protect a clearly identifiable creditor interest, without working an undue hardship on the debtor or causing harm to the debtor's other creditors.[2] Such a view fully comports with the legislative purpose of the stay in Chapter 11 cases which allows the debtor relief from prepetition debts, to free cash flow to meet current operating expenses, and ultimately to permit the debtor to restructure a business' finances. 1978 U.S.Code Cong. & Ad., News at 6179; *cited, In Re American Mariner, supra,* at 431.

**2.** R. Ginsberg, *Bankruptcy,* ¶ 3303 (1985).

**3.** By definition, equity has been defined as "the value, above all secured claims against the property that can be realized from the sale of proper-

The burden of proof in automatic stay litigation is allocated under § 362(g) of the Code. Therein, in pertinent part:

> In any hearing under subsection (d) or (e) of this section concerning relief from the stay

> .    .    .    .    .

> (1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and
> (2) the party opposing such relief has the burden of proof on all other issues. (11 U.S.C. § 362(g).

■ Thusly, the Movant, Needles has the burden of proof regarding the lack of equity, if any, the Debtor possesses in the subject property. *In Re Automatic Voting Machine*, 26 B.R. 970, 972 (Bankr.W.D. N.Y.1983). Further, under § 362(d)(2), both the equity test and the necessity for reorganization test must be met, as they are conjunctive tests. It now becomes necessary to determine if Needles, as the Movant, has met its burden of proof with respect to a lack of equity. Needles must do more than assert a mere allegation regarding a lack of equity, it must sufficiently demonstrate the absence of such.[3] Thusly, the property must be valued to measure the difference between the property value and the total amount of liens against it. To satisfy this concern, Needles offered as proof of value of its collateralized property copies of the Debtor's Chapter 11 Schedules showing the subject assets as follows:

"J. Office equipment, etc. . . . . . . . . . $61,955.00
K. Machinery, fixtures, etc. . . . . . . . . . 1,000.00
N. Patents, copyrights, etc. . . . . . . . . . 2,183.60"

On the premise that the above items were listed at market value, Needles further asserts that those items totalled $65,-138.60. That total reflects that the secured assets are less than the $80,536.73 secured claim due Needles, by some $15,000.00.

ty for the benefit of unsecured creditors." *La-Jolla Mortgage Fund v. Rancho El Cayen Assn.*, 18 B.R. 283, 287 (Bankr.S.D.Cal.1982).

Resultingly, Needles contends this calculation is conclusive evidence that the Debtor lacks equity in the property. Moreover, Needles asserts that the value of its collateralized assets have diminished in value, as indicated below:

| | |
|---|---|
| $200,000.00 | Collateralized assets purchase price in September, 1983 |
| (65,138.60) | Current value of subject assets per Debtor's Schedules |
| $134,861.40 | Decrease in value |
| ÷ | Number of months from commencement of Debtor's business to petition filing date |
| = $3,644.90 | Decrease in value per month |

Needles further asserts that the Debtor's total assets have decreased in the following manner, as reflected from Debtor's Statement of Financial Affairs:

| | |
|---|---|
| $203,932.00 | Initial value of assets per item # 4, page 1 |
| (87,338.59) | Market value per Debtor's Schedule B–2 |
| $116,593.41 | Decrease in assets |
| ÷ | Number of months from Debtor's business commencement to petition filing |
| = $3,151.17 | Decrease in value per month |

In further support of its argument that the Debtor lacks equity in the subject property, Needles offered the testimony of Michael Santosuosso as an expert witness to establish a valuation for the Debtor's assets, exclusive of the Debtor's liquor license,[4] and to further demonstrate that the Debtor's Schedules were unreliable in that the assets were overvalued or overstated. Unfortunately, Mr. Santosuosso's testimony was, at best, minimally beneficial to the Court. He offered no correlative values in terms of a liquidation value versus a going concern valuation of the assets. More importantly, and by his own admission, he made no specific visitation to the Debtor's premises to apply a valuation to the subject assets. At most, his purported valuation was casual and coincidental to his being on the Debtor's premises for apparently other purposes. Equivocally, he testified on direct examination that he applied a present value to the assets utilizing a going concern basis in the amount of $25,000.00, yet, on cross-examination, his testimony was that he applied a used value or what he "would pay to take the equipment out." The latter valuation method is more suggestive of a liquidation method as opposed to a going concern method of valuation. This was the only valuation testimony provided by Needles.

Throughout the hearing, the Debtor's counsel conceded that various dollar amounts contained in the Debtor's Schedules were inaccurate and would require amendment. Especially did the Debtor contend this was true concerning the value of its liquor license which it believed was undervalued. To this extent, the Debtor offered expert testimony to the effect that the liquor license had a value of $65,000.00. Subsequently, the Debtor caused its Schedules to be amended showing "patents and other general intangibles" to reflect an increase in value of $63,500.00. Apparently, this increase reflects a revalued amount for the liquor license although this amount is an unexplained $1,500.00 less than the value opined by the Debtor's expert witness. There remains, however, uncertainty regarding the nature of this increase since the Debtor failed to itemize its amendment to show how this increase under patents and intangibles was allocated. Such inadequate attention by the Debtor to its amendments to its Schedules is inexcusable and consistent with the incomplete and, concededly, inaccurate information provided by Debtor on its original Schedules. The Debtor's valuation expert's (Thomas Bliss) valuation of $65,000.00 for the liquor license was based on his examination of comparables and his prior experience with such licenses on a going concern basis. His cross-examination testimony, however, revealed he had not verified whether similar licenses were available at liquidation rates for licenses being held in escrow; nor did he obtain population statistics to ascertain

---

4. Upon the Debtor's motion, the Court disallowed the admission of Mr. Santosuosso's testimony as an expert; however, his testimony was admitted pursuant to Rule 701, Fed.R.Evid.

whether the subject location was eligible to have a newly issued license from the State. These factors cast some modicum of doubt as to the preciseness of Mr. Bliss' valuation. If accepted, either the $65,000.00 valuation figure of Thomas Bliss or the more unclear figure of $63,000.00 set forth in the Debtor's amendment to Schedules would tend to cause the Debtor's assets to significantly exceed its secured debt due to Needles.

■ The Court and a debtor's creditors should have reasonable comfort and reliance upon the financial information provided by a debtor when filing a petition for relief in a bankruptcy proceeding. The information not only is to be accurate and complete, but also in all other manner must fully conform to that information sought by the official forms to be filed with the Court. To do otherwise, potentially causes an unnecessary use of time and expense by the Court and parties in interest who have need to rely upon the accuracy and completeness of such data. Debtor's schedules, as filed, constitute an abuse of process, frustrate the purpose of the automatic stay, and fail to protect a clearly identifiable interest of a creditor (Needles).

In the matter at bar, upon evidentiary hearing, the Debtor acknowledged a need to revise much of its financial information provided to the Court. Of peculiar interest, this acknowledgement comes only at the instance of this adversary proceeding and not in advance thereof when the Debtor had more than ample time to make changes to its financial schedules if, in fact, there was any prior intent to do so. The lack of completeness of the Debtor's Statement of Financial Affairs is not inconsequential, but rather, it is quite substantial. The omission of loans made to the Debtor by its principals, the asserted underevaluation of a substantial asset such as a liquor license, the omission of loans provided by a principal lender, in addition to other incomplete data must be characterized as more than a mere oversight. Although it is possible that the Debtor's liquor license may have a market value in excess of the $2,000.00 the Debtor gave to it on its Schedules, the Court nor the parties in interest should be left in a realm of uncertainty or possibility as to a more accurate value. Any modifications to a debtor's Schedules should, at most, be few in number as opposed to requiring a major restructuring of its schedules. Debtor's Schedules required substantial modification. To allow otherwise raises the spectre of a filing lacking the requisite good faith.

The amendments to the Debtor's Schedules filed subsequent to the evidentiary hearing on this matter continue to provide incomplete data. The most significant change reflects an increase in the value of intangibles, apparently, a re-evaluation of the Debtor's liquor license.

The Debtor would have the Court to understand that the valuation of the liquor license represents a substantial asset of the Debtor; however, the evidence adduced does not reflect where any value was ever placed on this particular asset when the Debtor acquired its business assets. On the financial statements of the Debtor offered by the Movant to show operating losses for Fiscal Years 1984, 1985 and 1986 (Movant's Exhibit Numbers 22, 23 and 24), no value for liquor licenses appears as an asset on the balance sheet. This observation is rather remarkable. If the liquor license is so financially valuable, as claimed by the Debtor, and is such an integral part of its business operations, query, why does such not expressly appear on the Debtor's balance sheets.

A comparison of figures prepared by the Debtor is illuminating:

| Financial Reports | | Bankruptcy Schedule |
| --- | --- | --- |
| F.Y. ending 7–31–84 | F.Y. ending 7–31–86 | October, 1986 |
| $ 62,432.77 | $ 62,432.77 | |
| Leasehold improvements Less depreciation: | | |
| (–)6,243.00 | (–)31,217.00 | |
| 56,189.77 | 31,215.77 | |
| | | Office equip. (including china, glass-ware), machinery, fixtures, etc.    62,955.00 |
| Furniture, fixtures, etc.: | | |
| 189,805.27 | 193,919.63 | |
| Less depreciation: | | |
| (–)18,107.00 | (–)91,518.00 | |
| 171,698.27 | 102,401.63 | |
| China, glassware, etc.: | | Patent licenses & other intangibles    2,183.60 |
| 10,011.59 | 9,779.59 | 65,138.60 |
| Less depreciation: | | |
| (–)952.00 | 4,774.00 | |
| 9,059.59 | 5,005.59 | |

The record is silent to show where any value was placed on the liquor license when the Debtor purchased its business assets for $200,000.00 in 1984. Certainly, the above figures extracted from the Debtor's financial reports do not provide such a valuation, and it is not incumbent upon the Court to speculate whether such valuation was confused among the line items stated. Pointedly, there is no documentary evidence before the Court to show that the liquor license had any stated value at the time the Debtor acquired it from the Movant, yet three years later it has somehow become the Debtor's most valuable asset. Such is incredible.

■ Thusly, and in view of the above findings, assessment is in order as to whether the Movant has met its burden regarding the existence of equity. In this regard the Movant's valuation testimony pertaining to the liquor license was unpersuasive; however, it was entitled to rely upon the financial data made available to it by the Debtor which was contained in its Schedules and other discovered data. A thorough examination of the documentary evidence presented reveals that debts exceeded the value of Debtor's assets. The Debtor's subsequent amendments to its Schedules, again due to incompleteness, fails to cure that which was grossly deficient in the original Schedules. Although the testimony of the Debtor's valuation expert (Mr. Bliss) was more credible than that provided by the Movant's valuation witness, his testimony nevertheless was not entirely beneficial as the basis for his conclusion was deficient to the extent previously addressed. This deficiency is further impacted by the Debtor's insistence that a $65,000.00 value be applied to a liquor license which apparently was not valued at the time of its acquisition some three years ago, coupled with the inexactness of the amendments to its petition Schedules. Resultingly, and due to this continuing uncertainty regarding the valuation, the Court will rely on that data initially provided by the Debtor in its Schedules and, thusly, finds that the indebtedness of the Debtor substantially exceeds the value of its assets. Although a figure of $2,183.00 may or may not be an appropriate valuation for the subject liquor license, neither is the Court convinced that $65,000.00 is an appropriate valuation. Especially is this so

where there was no apparent valuation of the license at the time the Debtor acquired it, and the amended Schedules fail to comport with the testimony adduced by the Debtor.

■ Having found that the Debtor lacks equity in the subject assets under § 362(d)(2)(A), it next becomes necessary to determine whether the assets are necessary for an effective reorganization under § 362(d)(2)(B). In this regard, the burden of proof is upon the Debtor. The Debtor contends that should the automatic stay be lifted there would be no assets with which to conduct business or effect a reorganization. The indispensability of property is not, however, a sufficient basis to establish that the property is necessary for an effective reorganization. *In Re Mary Harpley Builder, Inc.*, 44 B.R. 151 (Bankr.N.D.Ohio 1984). There must also be some demonstration that a reasonable possibility of a successful reorganization exists. *In Re Shriver*, 33 B.R. 176, 187 (Bankr.N.D.Ohio 1983). Upon examination, the Debtor's president and largest shareholder, Alan Littman, equivocally testified that, both prepetition and postpetition, he has made efforts to sell the Debtor's subject assets. Later testimony of Mr. Littman was to the effect that he intended to stay in business and explained various changes effected to improve the postpetition posture of the business.

■ This conflicting testimony of Alan regarding the future use of the Debtor's assets is not beneficial to support the Debtor's argument that the assets are needed for an effective reorganization of the Debtor. If the assets indeed are necessary for an effective reorganization, query, why would the Debtor's principal officer make efforts to sell the assets both before and after petition filing. Further, more is required than a bare assertion by a Debtor that the property is necessary for its survival. *In Re Greiman*, 45 B.R. 574, 580 (Bankr.N.D.Iowa 1984). The majority view requires the Debtor to show that there is a reasonable possibility of a successful reorganization within a reasonable time. *Id.*,

(citations omitted). This, the Debtor at bar has failed to do. The burden of proof on this issue having been statutorily placed upon the Debtor, such burden has not been met.

The Movant, Needles Development Corporation, having met its burden under § 362(d)(2), the Court finds it unnecessary to address the Movant's § 362(d)(1) claim. Accordingly, the automatic stay is lifted with respect to the Movant.

IT IS SO ORDERED.