26 B.R. 549 (1983)
HUNTINGTON NATIONAL BANK, Plaintiff,
v.
A.K. FIBERGLASTICS, INC., Defendant.
In the Matter of A.K. FIBERGLASTICS, INC., Debtor.
Bankruptcy No. 3-82-02437, Adv. No. 3-82-0730.
United States Bankruptcy Court, S.D. Ohio, W.D.
January 20, 1983.
Barry P. Reich, Springfield, Ohio, for Plaintiff.
Robert N. Black, Jr., Columbus, Ohio, for debtor/defendant.

DECISION AND ORDER
CHARLES A. ANDERSON, Bankruptcy Judge.

FINDINGS OF FACT
This matter is before the court upon the pleadings and the evidence adduced at a hearing on January 5, 1982. The trial brief in behalf of Plaintiff was submitted within rule on January 13. Defendant has submitted no trial brief on or before January 19, within rule.
A.K. Fiberglastics, Inc. (Debtor) filed on 31 August 1982 its petition for an order of *550 relief under Chapter 11 of the Bankruptcy Code. Prior, thereto, Plaintiff Huntington National Bank (Bank) had on 26 January 1981 instituted foreclosure proceedings on the business real estate occupied by the Debtor, in the Common Pleas Court of Clark County, Ohio. Mildred J. Riggins and Kenneth E. Riggins, founders of Fiberglastics, had been killed in a car-train accident in September, 1981. The estate of Kenneth E. Riggins, deceased, who was President of Debtor, now owns 100% of the common stock. Judgments were granted by the state court against the Administrators of the decedents' estates; and, on 17 August 1982 an order of sale was issued to the Sheriff of Clark County. The appraised value on the order of sale was $100,000.00.
The last payment on the Bank loan was by the estate of Mildred Riggins in December, 1981; and the balance due and owing on one promissory note dated December 2, 1977 is in the amount of $78,268.49 ($71,169.55 principal and $7,099.14 accrued interest); and, one promissory note dated August 2, 1979, the amount of $77,749.91 ($68,174.15 principal and $9,575.81 accrued interest). The total arrearages in payments on both notes as of January 6, 1983, is in the amount of $39,865.67 and interest accrues at the rate of $45.81 per day. Real estate taxes are delinquent in an amount in excess of $5,000.00.
Alma L. Riggins, Administratrix of the estate of Kenneth E. Riggins, now serves as President of Fiberglastics. Neither she nor Janet Riggins, serving as Vice President, have had either extensive business experience in managing a business, or any experience whatever in the particular industry of Debtor. Since their management of the business, the business has shown inadequate improvement in profits and no operating cash has been developed. There are no adequate accounting records, profit and loss statements, or other necessary operating statistics. Consequently, Fiberglastics has filed no financial statements whatsoever for the Court records, as required by the standing court superintendency orders applicable in Chapter 11 cases. The only evidence submitted in behalf of Debtor as to business operations and financial conditions was the testimony of Alma Riggins, who had no documentation and answered all pertinent financial questions put to her (by her own admission) only "from memory." The real property and other assets have not been covered by insurance by the present management of Debtor. The only source of operating cash is from accounts receivable, and management is not certain of the status of such accounts or the net proceeds after payment of operating expenses because of the lack of cost accounting data. There was no testimony or other evidence adduced to demonstrate any possibility of, or even negotiations for, bank financing or any contribution of operating capital.
No plan of reorganization has been submitted and an application filed 5 January 1983 for an extension of the time for filing a plan has been set for hearing on 31 January 1983. The reason given for such an extension is, "That the Debtor will need additional time to produce the financial statements." It is further alleged ". . . that accounts [sic] recently retained by Debtor have discovered errors in previous financial statements."
On the positive side, there is testimony as to $85,000.00 per month gross sales and guessimates of $65,000-$67,000 in operating expenses. These undocumented figures contain no contingency funds for either mortgage loan amortization, or even debt service charges.
Extensive testimony was submitted in behalf of both Plaintiff and Defendant by qualified and experienced professional real property appraisers. The expert testimony as to fair market value of the premises is widely divergent, ranging from a low of $125,000.00 for the Bank to a high of $400,000 for Debtor. The testimony in behalf of Defendant Debtor was based upon more exhaustive research and field exploration than the testimony in behalf of Plaintiff and should be given considerable weight. On the other hand, even though not as thoroughly researched, the lower valuation is based primarily on two previous sales of *551 the same property in 1974 and 1977 at $118,000 and $110,000 respectively with only minimum attention to reproduction costs.
The Defendant's expert also researched the County Auditor's tax appraisal records and testified to a tax appraisal of $268,284.00. It is important to note, nevertheless, that the expert who appraised the property for the Debtor also acknowledged that the possibility of finding a buyer for the property at its true intrinsic market value is problematical under current area economic conditions.

I
Both state court decrees bear equal weight and are equally entitled to full faith and credit in the federal courts. They are res judicata to the extent of their respective jurisdictions. The effect of each court's judgment in the respective state courts is not at issue herein, even though this Court might concur that the jurisdiction obtained in the earlier Common Pleas Court litigation would preempt the rights of the parties in the later Probate Court litigation by the doctrines of lis pendens. Hence, the effect of the automatic stay of 11 U.S.C. § 362 in the bankruptcy court is not necessarily controlled or preempted by the definition of property interests in the state courts, and the thrust of the bankruptcy court jurisdiction would reach the effects of either one or both state court proceedings independently.
The definition and scope of property in the bankruptcy estate, therefore, is a federal question. If relief from the stay is dictated by applicable economic factors, thus to permit consummation of the foreclosure case, the question of delivery of good and merchantable title to a purchaser in the foreclosure suit should then be litigated in the Common Pleas Court.
This Court, therefore, should not reflect upon the finding of the Probate Court in its decree to the extent that court ". . . holds that the intention of Mr. and Mrs. Riggins [decedents] was for each to own an equal interest in the corporate assets, and therefore finds a resulting trust in the real estate to A.K. Fiberglastics, Inc., with Mr. and Mrs. Riggins each owing 50% of the corporate stock at the time of their respective deaths."
Looking to federal law, title and/or possession is no longer controlling as to what is the bankruptcy estate. The Bankruptcy Code provides that the commencement of a case creates an estate composed of all legal and equitable interests of a debtor in property. 11 U.S.C. § 541. The Congress then implemented this expanded concept of estate property by automatically staying all suits and lien enforcements against either the debtor or the debtors' estate. 11 U.S.C. § 362. The bankruptcy court, in addition to historical factors, has exclusive jurisdiction over the debtor and the estate without reliance upon either the terms of 28 U.S.C. § 1471 or the Rules adopted by district courts pursuant to the boilerplate Orders adopted by the Circuit Judicial Councils (by the Sixth Circuit on December 21, 1982). See the decision by this Court in Grose v. Johnson, 26 B.R. 530 (Bkrtcy.S.D.Ohio 1983).
Furthermore, the district courts would no doubt have "federal question" jurisdiction conferred by statutory provisions not encompassed in 28 U.S.C. § 1471, declared unconstitutional in Northern Pipeline Construction Co. v. Marathon Pipe Line Co. (1982), ___ U.S. ___, 102 S.Ct. 2858, 73 L.Ed.2d 598, 6 C.B.C.2d 785, 9 B.C.D. 67, assuming such can be delegated to the independent bankruptcy courts, as "adjuncts."
Hence, this Court must conclude that the resulting trust equitable interest of Debtor (as found by the Probate Court) would be a part of the bankruptcy estate even though the Common Pleas Court does not have (if needed) jurisdiction over the Debtor. The crucial issue, therefore, is whether the automatic stay should be lifted to enable the state court foreclosure suit to proceed inasmuch as the equitable interest of Debtor in the property would be affected.
Even though the Debtor may not be a necessary party in the foreclosure suit because the doctrines of lis pendens preempt the jurisdiction of the Probate Court, 11 *552 U.S.C. § 362 stays also enforcement of a judgment against property of the estate and any act to obtain possession of property of the estate. See 11 U.S.C. § 362(a)(2) and (3).

II
The Plaintiff argues that the Bank's interest in the premises "is not adequately protected," that "there is a lack of prospects for the effective reorganization," and that Defendant "has failed to take steps toward an effective reorganization."
The facts give considerable credence to these propositions, particularly to the extent there has been demonstrated no improvement in company financial conditions or any possibility of meeting debt service charges, now in arrears since December, 1981. Only the original principal obligations are provisionally protected by the most pessimistic appraisals of the encumbered property. There is a projected "equity cushion" under the more optimistic appraisals by Defendant's expert.
However, the optimistic "equity cushion" must be discounted because of the economic market conditions and the demonstrated failure of Fiberglastics to show any ability whatever to even meet debt service charges. A theoretical "equity cushion" is only one factor to be weighed and the importance thereof must be diminished in inverse ratio to the likelihood of a consummation of a successful reorganization. Since the foreclosure action has been pending now for two years, not only is the "equity cushion" being depleted as collateral for secured debts, but equitable considerations must contemplate the futile waste of economic resources available to other classes of creditors if leave is granted to conclude the foreclosure sale.
The deficiencies in management capabilities and the deplorable accounting records cast considerable doubt on improved net profit projections, particularly in light of current national economic conditions.
The Court is constrained to hold, therefore, that both principal and accrued debt service charges are not adequately protected by either the mortgage collateral or the prospects of turning the business operations and losses into a possible reorganization, absent an immediate influx of operating capital. The results of business operation since the Chapter 11 case was instituted on 31 August 1982 offer scant reason for optimism in this regard, despite the sincere and dedicated efforts by current management.
Consequently, it must be concluded that the necessity of adequate protection is now at a critical stage, and relief from the statutory stay of the state court foreclosure proceedings must be granted unless at least $30,000.00 is paid to Plaintiff on or before the date a plan of reorganization is filed, and then debt service charges are paid monthly to Plaintiff thereafter. The time limitations for the filing of a plan of reorganization and the date for tendering adequate protection will be fixed by the Court at the January 31 hearing.