**In the Matter of WEISER, INC., Debtor.**

**Bankruptcy No. 86–73–C.**

United States Bankruptcy Court, S.D. Iowa.

March 4, 1986.

David A. Hoyt, Jefferson, Iowa, for debtor.

Dallas J. Janssen, West Des Moines, Iowa, for Hoyt.

## MEMORANDUM OF DECISION

RICHARD STAGEMAN, Bankruptcy Judge.

This is a Chapter 11 case filed on January 10, 1986, by the debtor-in-possession, Weiser, Inc. The matters before the court include the Debtor's application to use cash collateral and a motion for relief from the automatic stay filed by the Perry State Bank ("Bank"). The Bank has objected to the Debtor's cash collateral application and the Debtor has filed a resistance to the Bank's motion for relief from stay.

On January 17, 1986, a preliminary hearing was held on the cash collateral application. At this hearing, the court ordered that the Debtor be permitted to temporarily use cash collateral provided the Bank was informed of all expenditures that

would exceed $200. On February 10, 1986, a final hearing was held on both the cash collateral application and on the motion for relief from the automatic stay. The court, having reviewed both the evidence adduced at hearing and the parties' legal arguments, now makes the following findings of fact and conclusions of law.

### I.

The Debtor operates a livestock and grain farm in Dallas County, Iowa. The livestock operation consists of a farrow to finish hog enterprise that is projected to produce 1,983 market hogs in 1986. This output level represents a 15% reduction from the previous two year's production average. The Debtor's president testified that the projected reduced output is the product of effort to increase the efficiency of the hog operation.

The projected output of 1,983 hogs assumes that the Debtor's hog herd will experience an 80% conception rate and will yield a 6.6 pig weaned per litter average. The Debtor also assumes that there will be a 3% death loss amongst the weaned pigs.

The Bank challenges the Debtor's ability to achieve the 6.6 pig weaned per litter average. Although such an average would approximate the state-wide average for mixed pasture and confinement hog operations,[1] the Bank asserts that the Debtor has not been able to obtain such results in previous years.

The Bank, relying primarily on the Debtor's income tax data, deduces that the Debtor has averaged between five and six pigs weaned per litter. The first step of the Bank's deductive process was to divide swine revenues from previous years by $100. The $100 figure was selected as the average price of a market hog in the selected years (1982 and 1983). Thus, the division by $100 yielded what the Bank believed to be the number of hogs sold in the selected years. The number of hogs sold was then divided by the number of sows

1. See *Livestock Enterprise Budgets for Iowa–1985,* Pub. FM1815, Cooperative Extension Service Iowa State University (1985).

the Bank believed the Debtor farrowed. This division by the number of sows yielded pigs per sow. Finally, the number representing pigs per sow was divided by the number of farrowings per year to yield pigs per litter.

This deductive process is beset with incorrect assumptions. The estimated value of $100 per hog would roughly equate to a market price of $43.50 per hundred weight.[2] The court notes, however, that the average market price for hogs in the relevant years was $52.60 and $47.99 per hundred weight.[3]

These higher actual prices indicate that the $100 per hog figure used by the Bank was substantially understated. Had the Bank used a more reasonable figure of $110–120 per hog, it would have deduced fewer market hogs sold and a significantly higher pigs per litter estimate. For this reason, the court dismisses the Bank's challenge to the Debtor's ability to generate 6.6 pigs weaned per litter.

Moreover, the testimony shows that the Debtor is making a concerted effort to increase the efficiency of the hog operation. The Debtor's veterinarian asserts that the hog herd is in excellent condition and that he has no reason to suspect a health problem. The Bank introduced evidence suggesting that the Debtor's method of summer farrowing was "atypical". The fact that the Debtor's president was named the outstanding pork producer in Dallas County in 1985 would suggest that the Debtor's "atypical" methods of production are not ineffective. The court, therefore, accepts the Debtor's estimates as to the number of hogs to be produced in 1986.

The Debtor projects that hog prices throughout 1986 will average $44.00 per hundred weight. Hog prices at country markets are currently fluctuating between $43.00 and $45.00. *Livestock Market Summary*, Iowa Department of Agriculture (Feb. 14, 1986). The Debtor markets some hogs through packing plants which

typically yield a $1.00–2.00 premium. *Id.* Although hog prices are expected to dip somewhat in the spring months, a rebound is projected to occur in the summer and continue throughout the remainder of the year. Des Moines Sunday Register, February 23, 1986, at F2, col. 4. The court, therefore, accepts the $44.00 estimate of hog prices as being reasonable.

The Debtor has contracted to rent several hundred acres on which it intends to produce corn, soybeans and oats. From these rented acres, the Debtor expects to generate approximately $30,000 in net revenue. If the Bank's crop projections are adjusted to remove debt servicing costs and to reduce rent charges to actual levels, the Bank's crop gross profit forecast would closely approximate the Debtor's own estimate. The court, therefore, finds that the Debtor's cost and yield estimates for its crop enterprise are reasonable.

The Debtor estimates that revenues from the hog and grain operations will total approximately $411,000. Expenses, exclusive of interest costs and living expenses provided to the Debtor's principals, will total approximately $341,000. Thus, the Debtor projects that $70,000 will be available for debt service and living expenses for its principals. As noted above, these projections are based on reasonable estimates of the commodity prices, yields and costs the Debtor anticipates in 1986. These estimates are, therefore, adopted by the court.

Prior to the filing of this petition, the Bank served as the Debtor's primary source of operating funds. As of the date the Debtor's petition was filed, the principal and interest owing to the Bank totaled approximately $518,000.[4] This debt was declared in default by the Bank one week before the Debtor's petition was filed. To secure this indebtedness, the Bank has taken a security interest in the Debtor's livestock, machinery, crops and farm products. On the schedules accompanying its petition,

---

**2.** This assumes that the average market hog weighs 230 pounds.

**3.** *Prices Received by Farmers,* Iowa Crop and Livestock Reporting Service (1983).

**4.** Approximately $86,000 of this amount represents the Debtor's contingent liability on a guarantee of David Weiser's debt to the Bank.

the Debtor valued the Bank's collateral at approximately $209,000. For purposes of the cash collateral application and the relief from the stay motion, the Bank accepts the Debtor's valuation.

The Debtor seeks permission to use proceeds from livestock sales to fund its farm business throughout the remainder of 1986. Although the Debtor's hog herd and feed stocks will be depleted by these sales, new livestock will be added through the semi-annual farrowings and the value of the herd will increase through maturation. To the extent that the value of the herd and feed stocks would drop below the value of these inventories as of the date the petition was filed, the Debtor has proposed paying the Bank in cash for any such deficiency. The estimated values of the hog herd at the beginning of each month throughout the remainder of 1986 are listed in the Appendix. Also included in the Appendix is an estimate of the Debtor's monthly net cash flow.

## II.

Because the Bank has objected to the Debtor's proposed use of cash collateral, the Debtor must establish that the Bank will remain adequately protected throughout such use. 11 U.S.C. § 363(e), (o). The Debtor's offer of adequate protection consists of proposed cash payments to the Bank to the extent the value of the hog and feed stock inventory drops below the value that existed on the date the petition was filed.

■ An adequate protection proposal should, as nearly as possible under the circumstances of the case, provide the secured creditor with the value of its bargained for rights. *In re Martin*, 761 F.2d 472, 476 (8th Cir.1985). In assessing an adequate protection proposal, this court must (1) establish the value of the secured creditor's interest, (2) identify the risks to the secured creditor's value resulting from the debtor's request for use of cash collateral, and (3) determine whether the debt-

or's adequate protection proposal protects value as nearly as possible against risks to that value consistent with the concept of indubitable equivalence. *Id.*

■ Neither the Bankruptcy Code nor the case law clearly dictates how the "value" of the Bank's interest is to be determined. The determination of the value of a secured creditor's interest is to be made independently in each case and in light of equitable principles. *In re Briggs Transportation Company*, 780 F.2d 1339, 1345–46 (8th Cir.1985), *citing, In re American Mariner*, 734 F.2d 426, 431 (9th Cir.1984). As the *Briggs* court stated, "The bankruptcy code's design, the legislative compromises from which the statute was constructed, and the developing case law all indicate that the creditor's rights to be afforded adequate protection in a given situation depend on a variety of factors the exact character of which will vary from case to case and may, but will not always, include the payment of interest for opportunity costs." *Id.* at 1346.

■ At this early stage of the Debtor's case, the court cannot find that the rights to be afforded adequate protection include the payment of interest for the Bank's opportunity costs. This is a situation where giving the Bank the absolute right to enforce the strict terms of its contract would be seriously detrimental to the reorganizational thrust of Chapter 11. See H.Rep. No. 595 at 339, reprinted in 1978 U.S.CODE CONG. & AD.NEWS 5787, 6295. To require the Debtor to provide compensation for the Bank's opportunity costs at this stage would risk sapping the Debtor of cash and property that will be essential to maintain operations. At this time, therefore, the Bank is not entitled the protection of its opportunity costs.

■ The value of the Bank's livestock collateral [5] however, must be protected. At the outset of this case, the livestock and feed inventory had a value of approximate-

---

**5.** The Bank's objection to the Debtor's proposed use of cash collateral extends only to the livestock proceeds that the Debtor desires to use. The objection cannot be read as a general Section 363(e) objection to the Debtor's use of collateral.

ly $134,000. At a minimum this value must be protected throughout the proceeding.

■ The risks to the Bank's interest created by the Debtor's proposed use of cash collateral include the risk of disease and the potential for weather induced problems in the conception and weaning of newborn pigs. The record before the court indicates that the Debtor has recently experienced a problem with herd disease. Although testimony of the Debtor's veterinarian indicates that the livestock herd is currently disease free, the court cannot ignore the recent history and the potential for disease amongst even the most carefully managed herds.

There also exists a risk that the market price of livestock may fall and that the cost of livestock feed may rise. The court notes, however, that the prices forecast by the Debtor are conservative estimates supported by the projections of reputable market analysts. Finally, the Debtor has contracted for insurance coverage that would protect the Bank's interest in the event the herd and feed stocks perished by fire or some other natural disaster.

An evaluation of the Debtor's adequate protection proposal in light of the risks to which the Bank's collateral is being subjected leads the court to conclude that the proposal temporarily will provide adequate protection to the Bank. It is apparent that either the hog and feed inventory value will exceed the date of petition inventory value, or that the Debtor will have sufficient cash available to pay the Bank any deficiency. Appendix. The offer to make cash "deficiency" payments and the presence of a significant cash reserve will insure that the Bank's collateral position will not be eroded through the Debtor's use of cash collateral.

For this adequate protection proposal to be effective, it is imperative that the Debtor fully cooperates with all reasonable inquiries made by the Bank to insure that its livestock and feed stock collateral position does not decline below $134,000. If at any time, the livestock and feed stock collateral position (including any prior cash "adequate protection" payments), declines below $134,000, the Debtor shall promptly deliver to the Bank cash equal to the deficiency. Given the nature of the instant collateral and the adequate protection offer, the court cannot allow this determination to be final. Upon an application of either party, the court will re-evaluate the matter anytime after the one hundreth day following the date of this determination.

The court finds that the Debtor's proposal will, as nearly as is possible under the circumstances of this case, provide the Bank with the value of its bargained for rights. In order to encourage reorganization, the court has been flexible in applying the adequate protection standard to the facts of this case. It is the court's view, however, that this flexible approach will not operate to the detriment of the Bank's interest.

### III.

■ The Bank seeks relief from the stay both for cause and for lack of equity and necessity. 11 U.S.C. § 362(d)(1)–(2). Section 362(d)(2) mandates relief from the stay if the debtor lacks equity in the property and the property is not necessary for an effective reorganization. Although the Bank has the burden of proving lack of equity, 11 U.S.C. § 362(g)(1), the Debtor's own schedules establish that its debt to the Bank substantially exceeds the value of the Bank's collateral. The court, therefore, must determine whether the instant property is necessary for an effective reorganization.

■ When considering the "necessity for an effective reorganization" standard of Section 362(d)(2), this court generally requires more than a bare assertion by the debtor that the property is necessary for survival and reorganization. *E.g. Matter of Tiffany*, Case No. 84–1818–C, slip opinion at 4–5 (Bkrtcy.S.D.Iowa 1985). The majority of courts hold that Section 362(d)(2)(B) forces the debtor to establish that there is a reasonable possibility of a successful reorganization within a reasonable time. *E.g. In re Development, Inc.*, 36 B.R. 998, 1005 (Bkrtcy.D.Hawaii 1984). Nevertheless, the kind of factual showing a debtor must make

to sustain its burden under Section 362(d)(2)(B) is governed by the facts of each case. See *In re Greiman*, 45 B.R. 574, 580 (Bkrtcy.N.D.Iowa 1984). When a reorganization is in its infancy, a lesser showing of likelihood for an effective reorganization may be sufficient. *Id.*

■ Here, the Debtor has shown that it will generate approximately $70,000 that will be available for servicing debt and providing living expenses for its principals. Nevertheless, if the Bank persists with its apparent desire for liquidation, this Debtor will not be able to confirm a rehabilitative plan of reorganization. See *Matter of Parker*, Case No. 84–1854–C, slip opinion (Bkrtcy.S.D.Iowa 1985) (plan could not be confirmed over objection of creditor who controlled a secured creditor class and the unsecured class unless such creditor was provided payment of its full claim with interest). See also 11 U.S.C. § 1129(b)(2). If, therefore, this reorganization is to succeed, there will need to be concessions made both by the Debtor and by the Bank.

At present, it is apparent that the Bank has determined that liquidation is inevitable and that the sooner this liquidation occurs, the better. The court, however, sees both the Debtor's projected net revenue and areas where additional funds could be made available for debt servicing (i.e., rental payments made by Debtor to its principals), and concludes that this reorganization effort is not hopeless. The Debtor's tentative factual showing of an ability to reorganize has, in the court's view, satisfied the burden placed on nascent debtors by Section 362(d)(2)(B) and (g)(2). See *In re Greiman*, 45 B.R. at 580. The Bank, therefore, is not entitled to relief under Section 362(d)(2). As this case progresses, it is hoped that the Debtor's operation and cooperation will convince the Bank and the court that liquidation is not in the best interests of all those involved in this case.

The Bank also seeks relief from the automatic stay under Section 362(d)(1). If the automatic stay is to be left in effect, the Debtor must establish that the Bank's interest in its collateral is adequately protected. 11 U.S.C. § 362(d)(1), (g).

■ The court, after analyzing the Debtor's cash collateral application, ruled that the Bank's interest in its livestock and feed stock collateral was adequately protected. See *supra* at pp. 115–116. The Bank, however, has additional collateral that is entitled to adequate protection. As to this additional collateral, the Debtor has not come forward with an offer of adequate protection. It is the court's function to pass upon the adequacy of the protection offered by the debtor rather than to formulate and order adequate protection on its own initiative. *In re Cash Currency Exchange, Inc.*, 52 B.R. 577, 581 (Bkrtcy.N.D. Ill.1985). Because the Debtor has not offered adequate protection as to the Bank's non-livestock/feed collateral, the court must grant the Bank relief from the automatic stay. The stay will be lifted on the fifteenth (15th) day following the date the court's order is entered. If in the interim, the Debtor can fashion an offer of adequate protection, the court will, on the Debtor's motion, review the adequacy of the offer if such a review becomes necessary.

An appropriate order will be entered.

### ORDER

On the 3rd day of March 1986, the court entered a memorandum of decision in the above entitled case.

NOW, based on that memorandum of decision, the court enters the following order.

It is, ORDERED, that the Debtor's application to use the cash collateral of the Perry State Bank is approved subject to the following condition. To the extent that the value of the Debtor's livestock herd and feed stocks drops below the value of these inventories as of the date the petition was filed, the Debtor must promptly pay the Bank in cash for any such deficiency. The Debtor shall, on a monthly basis, provide the Bank with an itemized valuation of its livestock herd and feed stocks. Any payments from the Debtor to the Bank

under this ORDER shall be included in total value of the Debtor's livestock herd and feed stocks.

It is further, ORDERED, that the Perry State Bank's motion for relief from the automatic stay is granted with respect to the collateral not covered by the cash collateral ORDER. The stay will be lifted on the Bank's collateral (exclusive of the Debtor's livestock and feed stocks) on the fifteenth day following the date of this ORDER.

## APPENDIX

| | Feb. | Mar. | Apr. | May | June | July | Aug. | Sept. | Oct. | Nov. | Dec. | Jan.'86 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beg. Hog Inv. | 97,424 | 119,931 | 139,386 | 123,713 | 100,317 | 106,619 | 100,278 | 124,248 | 56,348 | 68,448 | 81,248 | 92,828 |
| End Hog Inv. | 119,931 | 139,386 | 123,713 | 100,347 | 106,619 | 100,278 | 124,248 | 56,348 | 68,448 | 81,248 | 92,828 | 102,788 |
| Net Change | 22,507 | 19,455 | (15,673) | (23,366) | 6,302 | (6,341) | 23,970 | (67,900) | 12,100 | 12,800 | 11,580 | 9,960 |
| Receipts | 16,251 | 28,109 | 60,421 | 49,389 | 16,368 | 21,010 | 9,187 | 86,780 | 61,883 | 58,828 | -0- | 2,400 |
| Cash Outlays | 25,236* | 53,685 | 23,671 | 22,995 | 19,359 | 21,352 | 22,206 | 36,740 | 13,502 | 49,308* | 22,475 | 30,430 |
| Net | (8,985) | (25,576) | 36,750 | 26,394 | (2,991) | (342) | (13,019) | 50,040 | 48,381 | 9,520 | (22,475) | (28,030) |
| Beg. Cash | 36,479 | 27,494 | 1,918 | 36,750 | 63,144 | 60,153 | 59,811 | 46,792 | 96,882 | 145,213 | 154,733 | 182,258 |
| End. Cash | 27,494 | 1,918 | 36,750 | 63,144 | 60,153 | 59,811 | 46,972 | 96,882 | 145,213 | 154,733 | 182,258 | 104,228 |

* 15,928 for crop expenditures was moved from February to November. The court expects that the Debtor will be able to find supplier credit for the expenditures.