**In re GALLEGOS RESEARCH GROUP, CORPORATION, EIN 84–0690579, Debtor.**

**In re INCA GROUP, LTD., EIN 84–1049149, Debtor.**

**Bankruptcy Nos. 94–10424 MSK, 94–13389 MSK.**

United States Bankruptcy Court, D. Colorado.

Feb. 13, 1995.

Thomas E. Croak, Thomas E. Croak Law Office, Longmont, Colorado, for Debtor Inca Group, Ltd.

William Van Horn, Leo Weiss and John A. Weeda, Office of the U.S. Trustee, Denver, Colorado.

Robert Ripple, Denver, Colorado, for Colorado Department of Revenue.

Douglas Vasquez, Denver, Colorado, for Small Business Administration.

James L. Brown, King, Peterson, Brown, L.L.C., Morrison, Colorado, for Gallegos Research Group, Corporation.

## MEMORANDUM OPINION AND ORDER

MARCIA S. KRIEGER, Bankruptcy Judge.

THESE MATTERS come before the Court under Fed.R.Bankr.P. 4001(d) for consideration of unopposed motions by Inca Group, Ltd. and Gallegos Research Group, Corporation (hereinafter referred to as Inca, Gallegos or Debtor(s)) to approve three agreements relating to relief from automatic stay, use of cash collateral and adequate protection (hereinafter Agreements). These Chapter 11 cases are unrelated. Because the Agreements contain similar problematic provisions, I have consolidated my consideration of the motions.

## I. JURISDICTION

This Court has jurisdiction over these matters pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (G), (M) and (O).

## II. PROCEDURAL HISTORY

### A. Inca Group, Ltd.

Inca filed its voluntary Chapter 11 petition on April 4, 1994. At the time of the filing, it was indebted to the United States of America, for taxes collected by the Internal Revenue Service (IRS) and the State of Colorado, for taxes collected by the Colorado Department of Revenue (Colorado) each of which claim to hold tax liens. Two months after the bankruptcy filing, Colorado filed a motion requesting turnover of money held by Inca and segregation of cash collateral. The IRS and Inca objected.

Prior to the hearing on Colorado's motion, Inca filed its proposed Plan of Reorganization and Disclosure Statement. At the hearing, the parties advised the Court that the dispute had been settled and the terms of settlement were reflected in the Plan of Reorganization and in a proposed adequate protection agreement which would be filed with the Court. The Court continued the hearing, but ordered that if an adequate protection agreement was proposed, notice be given to creditors pursuant Fed.R.Bankr.P. 4001.

Inca filed and gave notice pursuant to Rule 4001 of two separate agreements regarding use of cash collateral and adequate protection, one with the IRS (Inca–IRS Agreement) and one with Colorado (Inca–Colorado Agreement). No objections were raised. However, due to concerns about the terms of the Agreements, the Court scheduled a hearing on the proposed Agreements and in its Order setting the hearing specified the issues and provisions it considered problematic. Hearing on the Agreements was held on November 30, 1994. Counsel for Inca, the IRS and Colorado presented argument but offered no legal authority regarding the legality and enforceability of the specified problematic provisions in the Agreements.

### B. Gallegos Research Group, Corporation

Gallegos filed its voluntary Chapter 11 petition on January 18, 1994. On August 22, 1994, it entered into an agreement with the IRS, Colorado and the Small Business Ad-

ministration (SBA) regarding the use of cash collateral and provision of adequate protection (Gallegos Agreement). Notice of the Agreement was given pursuant to Fed. R.Bankr.P. 4001. No objections were raised.

## III. FACTUAL FINDINGS

Each Agreement authorizes the Debtor identified to use cash collateral under specified circumstances and for specified purposes, provides the IRS, Colorado, and/or SBA (hereinafter Secured Creditors) with adequate protection for their secured claims and specifies remedies for the Secured Creditors in the event of the Debtor's default. The Agreements do not contain identical provisions; however, there are strikingly similar provisions in the Inca–IRS and Gallegos Agreements.

### A. The Inca–IRS and Gallegos Agreements

Both Agreements:

1. itemize the Debtor's prepetition tax obligation to the IRS, only a portion of which is subject to a federal tax lien. (Inca's prepetition tax debt was $236,837.98; $214,375.05 is allegedly secured. Gallegos was indebted to the IRS for $31,874.29; $20,322.79 of which is allegedly secured);

2. state that the IRS holds a lien interest in all property and rights of the Debtor, including real property, inventory, furniture, fixtures, equipment, accounts, contract rights, and cash and cash equivalents;

3. acknowledge that there are other creditors who hold lien interests in the itemized collateral, but neither Agreement specifies the priority of such liens or the extent to which any creditor is secured or unsecured;

4. fail to state whether the Secured Creditors are fully or partially secured. They also fail to state the value of the collateral or the anticipated diminution in value of the collateral during the course of the reorganization case. Indeed, both Agreements contain language evidencing the parties' unwillingness and inability to determine the value of the collateral or diminution:

WHEREAS, the parties to this stipulation recognize that the measurement of diminution of value is imprecise without formal appraisals the cost of which neither the Debtor nor the United States wish to bear and have agreed that a monthly payment as set out below will adequately protect the Internal Revenue Service. (Inca–IRS Agreement, page 2.)

. . . . . . . . . . . . . . .

WHEREAS, the true value of the collateral is subject to speculation and uncertainty due to the nature of the collateral and the precarious financial status of the Debtor and none of the parties wish to expend the time and resources to determine its true value given the more immediate survival needs of the Debtor.

WHEREAS, the issue of relative priorities between the secured creditors cannot be readily resolved (the situation likely involves a circular priority question between the parties with multiple periods of tax each with its own date of priority) and their *relative entitlement to adequate protection cannot be readily determined;* (Gallegos Agreement, page 2) (emphasis added);

5. in exchange for use of cash collateral, grant the Secured Creditors a replacement lien in all postpetition personal property of the Debtor, without specification as to the amount of the lien (Inca–IRS Agreement, paragraph 3; Gallegos Agreement, paragraph 3) and require the Debtor to make monthly cash payments to the Secured Creditors. These payments are to be applied to the prepetition secured claim and to postpetition compound interest. (Inca–IRS Agreement, paragraph 9; Gallegos Agreement, paragraphs 5 and 6);

6. require that upon sale or merger of the Debtor's business or substantially all of its business assets, the Debtor must pay the entire prepetition tax liability due to the Secured Creditors from the sale proceeds. (Inca–IRS Agreement, para-

graph 20; Gallegos Agreement, paragraph 22);

7. require the Debtor to incorporate specific terms of the Agreement into any proposed Plan of Reorganization. (Inca–IRS Agreement, paragraph 22; Gallegos Agreement, paragraph 24.) For example, terms required in the plan include all default provisions affecting the operation of the Debtor's business, a requirement that no prepetition federal tax liability be discharged until all federal tax liability, interest and penalties have been paid in full and restrictions on the use of proceeds from a sale of the Debtor's assets;

8. provide that upon default, the Secured Creditors are entitled to *automatically* obtain relief from stay to proceed against the Debtor and its assets for collection of both prepetition and postpetition liabilities; to *automatically* obtain dismissal of the case "with prejudice so as to enable the IRS to pursue its administrative or judicial collection remedies without a subsequent bankruptcy filing"; or to *automatically* obtain conversion to Chapter 7, in which case the Debtor may not "move for conversion back to Chapter 11". (Inca–IRS Agreement, paragraph 18; Gallegos Agreement, paragraph 20.) The defined events of default include failure to timely pay taxes and entry of an order granting relief from stay to any junior lienor or conversion of the case to Chapter 7;

9. grant each Secured Creditor the right, "subject to review by the bankruptcy court," to exercise the remedies upon default even in the absence of a "formal event of default" if the creditor determines that collection of the prepetition tax is in jeopardy (Inca–IRS Agreement, paragraph 19; Gallegos Agreement, paragraph 21).

## B. The Inca–Colorado Agreement

The Inca–Colorado Agreement states that the Debtor's total tax obligation of $36,988 is secured by "all assets owned or used by Debtor". (Inca–Colorado Agreement, paragraph 3.) There is no valuation of the collat-eral, except accounts receivable. There is no representation as to the anticipated diminishment of the value of the collateral during the course of the case.

Colorado acknowledges that it is oversecured because the Debtor's accounts receivable, alone, exceed $86,600. Colorado agrees to accept postpetition interest at the prepetition claim rate of 8 percent per annum.

In exchange for authorizing the Debtor to use the cash collateral, the Agreement provides adequate protection to Colorado through a replacement lien on all inventory, accounts receivable and cash of the estate "whenever acquired" but the amount of the lien is not specified. (Colorado Agreement, paragraph 9.) The Agreement also provides that if the Debtor refiles a bankruptcy case within 60 days following dismissal, the Debtor will not oppose any motion by Colorado for relief from stay to pursue all collection remedies.

## IV. ANALYSIS

### A. Standard of Review

■ Notice of the proposed Agreements was given pursuant to Fed.R.Bankr.P. 4001(d) and no objections were raised. At the hearing on the Agreements in the Inca case, the IRS and Colorado argued that because no creditors had objected to the Agreements, the Court was required to approve them. In essence, the IRS and Colorado argue that the Court has no oversight authority or obligation, except when proposed agreements relating to relief from the automatic stay, adequate protection or use of cash collateral are contested.

There is little case law addressing the role of a bankruptcy court in approving or disapproving cash collateral, adequate protection and relief from stay agreements except where creditors object. Often, proposed agreements submitted early in a bankruptcy case are approved *pro forma* when no objections are raised. Other times, courts may advise the parties as to the unacceptability of particular provisions in a proposed agreement. The agreement is then modified and resubmitted for approval. However, there are circumstances in which courts have re-

fused to approve unopposed cash collateral agreements or to enforce previously approved cash collateral agreements where notice was inadequate or the terms of the agreement legally impermissible. *See, e.g., Matter of Embrace Systems Corp.,* 174 B.R. 240 (Bankr.W.D.Mich.1994); *In re Life Imaging Corporation,* 131 B.R. 174 (Bankr. D.Colo.1991); *In re Buzzworm, Inc.,* 178 B.R. 503 (Bankr.D.Colo.1994).

The Bankruptcy Code does not specifically refer to agreements relating to relief from the automatic stay, or the use of cash collateral or providing adequate protection. These types of agreements are subject to Fed.R.Bankr.P. 4001(d)(3) which by its express terms authorizes a bankruptcy court to approve or disapprove such agreements in the absence of an objection.

> [I]f no objection is filed, the court may enter an order approving or disapproving the agreement without conducting a hearing.

■ This authority is consistent with the bankruptcy court's role as guardian of the bankruptcy process. Although the bankruptcy process provides debtors and creditors much latitude for negotiating and restructuring their relationships, the bankruptcy court retains the authority and obligation to ensure that the bankruptcy process progresses in a legally permissible fashion consistent with the Bankruptcy Code and Rules. *See In re Interwest Business Equipment, Inc.,* 23 F.3d 311, 318 (10th Cir.1994); *In re Neidig Corp.,* 117 B.R. 625, 632 (Bankr.D.Colo.1990); *In re Busy Beaver Building Centers, Inc.,* 19 F.3d 833, 841 (3d Cir.1993) (quoting *In re Evans,* 153 B.R. 960, 968 (Bankr.E.D.Pa.1993)). This Court shares the view expressed by many judges in this District and elsewhere that the integrity of the bankruptcy system must be protected and fundamental due process must be provided. The public has a right to expect that an order of a court is a judge's certification that proper notice has been given and that the result is justified under the law.

In this jurisdiction, the leading case analyzing terms of an unopposed cash collateral/adequate protection agreement is *In re Blehm Land & Cattle Co.,* 859 F.2d 137 (10th Cir.1988). In *Blehm,* the court was presented with an administrative expense claim based upon an *ex parte* adequate protection agreement which had not been submitted for prior court approval. The issue presented was whether, in the absence of court approval, the agreement should be enforced and the administrative claim allowed. The bankruptcy court disallowed the claim. On appeal, the district court affirmed.

The Tenth Circuit's reasoning in *Blehm* offers important guidance with regard to adequate protection and cash collateral agreements. The Tenth Circuit held that while prior approval of adequate protection agreements is prudent, it is not a prerequisite to their later enforcement. Thus, the court concluded that *ex parte* agreements should be subject to strict scrutiny prior to allowance of related administrative expense claims. In scrutinizing such agreements, the bankruptcy court was instructed to consider:

1. whether the agreement is consistent with the intent and purpose of the Bankruptcy Code;

2. whether the conduct of the secured creditor has been equitable;

3. whether effecting the agreement would create an inequitable result; and

4. if the proffered adequate protection was too generous, whether the agreement should be modified or set aside.

*Blehm,* 859 F.2d at 140 citing *In re B & W Tractor,* 38 B.R. 613, 617 (Bankr.E.D.N.C. 1984).

The Tenth Circuit also declined to treat the agreement as a settlement or compromise requiring notice to all creditors pursuant to Fed.R.Bankr.P. 9019. In reaching this conclusion, the court focused upon the due process rights of creditors affected by an adequate protection agreement. Relying on the reasoning in *Bramham v. Nevada First Thrift (In re Bramham),* 38 B.R. 459, 466 (Bankr.D.Nev.1984), the Tenth Circuit distinguished between the due process due to creditors in matters involving solely adequate protection issues and broader scope issues. This distinction is consistent with fundamental concepts of due process requiring that creditors be provided with notice

and opportunity to object prior to any modification or extinguishment of their rights or interests. *Reliable Electric Co., Inc. v. Olson Construction Co.*, 726 F.2d 620 (10th Cir.1984). Notice of proposed adequate protection agreements is limited to committees elected pursuant to § 705 or § 1102 of the Code or their authorized agents and if no committee of unsecured creditors has been appointed, to the twenty largest unsecured creditors listed in accordance with Rule 1007(d). Fed.R.Bankr.P. 4001. The court reasoned that such limited notice, especially at the beginning of a case, is appropriate when the agreement pertains only to adequate protection of an allowed secured claim. However, if something more than mere adequate protection of an allowed secured claim is contemplated by the agreement, due process is assured only by compliance with Fed. R.Bankr.P. 9019(a) which requires notice to all creditors, the U.S. Trustee and indenture trustees.

■ Ultimately, the case was remanded for an evidentiary hearing to determine the proper amount of adequate protection. *Blehm,* 859 F.2d at 141. This is because issues of adequate protection are questions of fact. *MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1397 (10th Cir. 1987).

## B. Creditor's Entitlement to Adequate Protection

■ Due to the effect of the automatic stay, creditors are entitled to adequate protection of their secured claims during a bankruptcy case. Adequate protection means that the value of the creditor's interest in the collateral must be protected from diminution while the property is being used or retained in the bankruptcy case. *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). The concept is derived from the Fifth Amendment's protection of property interest. *See Wright v. Union Central Life Ins. Co.*, 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940); *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935).

■ The Bankruptcy Code does not define adequate protection. Instead, 11 U.S.C. § 361 provides a list of nonexclusive examples. These include lump sum cash payments, periodic cash payments and additional or replacement liens. Under § 361(3) courts may fashion other forms of adequate protection based upon equitable considerations arising from the particular facts in each case. *Bramham v. Nevada First Thrift (In re Bramham)*, 38 B.R. 459, 466 (Bankr.D.Nev. 1984).

■ Despite its form, the entitlement to and measure of adequate protection is always determined by the extent of the anticipated or actual decrease in the value of the secured creditor's collateral during the bankruptcy case. *In re First South Savings Assoc.*, 820 F.2d 700, 710 (5th Cir.1987). Therefore, to determine whether an entity is entitled to adequate protection and the type and the amount of adequate protection required, a court must determine the value of the collateral, the creditor's interest in the collateral and the extent to which that value will decrease during the course of the bankruptcy case. Where a debtor desires to use cash collateral, a court must determine the value of the creditor's interest in the cash collateral and whether the debtor's proposed use of cash collateral would impair that interest, and to what extent adequate protection is required. *Martin v. U.S. Commodity Credit Corp. (In re Martin)*, 761 F.2d 472, 476–77 (8th Cir.1985); *In re Dynaco Corp.*, 162 B.R. 389 (Bankr.D.N.H.1993); *In re Weiser,* 74 B.R. 111, 115 (Bankr.S.D.Iowa 1986).

■ Because creditors are entitled to adequate protection only to the extent that the value of the property securing their claim diminishes, undersecured creditors are not entitled to adequate protection for lost opportunity costs. *Timbers,* 484 U.S. at 365, 108 S.Ct. at 627. Oversecured creditors may not be entitled to cash payments or postpetition liens because they are adequately protected through the existence of a value cushion. Whether a value cushion is sufficient to provide adequate protection must be determined by the facts in each case. *Kost v. Interstate Bank of Greybull (In re Kost)*, 102

B.R. 829, 831 (D.Wyo.1989); *In re Johnson,* 90 B.R. 973, 980 (Bankr.D.Minn.1988); *In re Heath,* 79 B.R. 616, 618 (Bankr.E.D.Pa.1987). If the value cushion is small, the prospects for reorganization slim or the process will likely be protracted, the equity cushion may be insufficient adequate protection. *See In re James River Assoc.,* 148 B.R. 790, 797 (E.D.Va.1992) (granting relief from stay where equity eroded by priming lien required for reorganization); *In re Schaller,* 27 B.R. 959, 960 (W.D.Wis.1983) (finding lack of adequate protection where equity continually decreasing as interest came due); *Ukrainian Savings & Loan Assoc. v. Trident Corp.,* 22 B.R. 491, 493 (E.D.Pa.1982) (finding equity cushion too slim to provide adequate protection); *Huntington Nat'l Bank v. A.K. Fiberglastics, Inc.,* 26 B.R. 549, 552 (Bankr. S.D.Ohio 1983) (finding secured creditor inadequately protected given poor prospects of reorganization). However, where the value cushion is substantial and is sufficient to provide for the entirety of the creditor's claim under 11 U.S.C. § 506(a), no additional protection may be required. *See, e.g., Downey Savings and Loan Assoc. v. Helionetics, Inc. (In re Helionetics, Inc.),* 70 B.R. 433, 440–41 (Bankr.C.D.Cal.1987).

## C. Inadequacy of Agreements and Notice

This Court declines to approve the proposed Agreements for three reasons. First, none of the Agreements present a sufficient factual foundation upon which the creditors or the Court can determine whether and to what degree adequate protection is appropriate. Second, the proposed adequate protection is legally impermissible based upon the factual foundation supplied. Third, the Agreements contain ancillary provisions which exceed the scope of adequate protection and potentially affect the entire course of the reorganization. Assuming such provisions are permissible outside a proposed reorganization plan, all creditors must be given notice and an opportunity to object. The limited notice provided pursuant to Fed. R.Bankr.P. 4001(d) was inadequate.

As a threshold issue, an adequate protection agreement must contain facts supporting the proposed type and amount of adequate protection. Because all forms of adequate protection are designed for only one purpose, to protect secured creditors against a diminution in the value of their collateral, an agreement must contain facts sufficient to establish the amount, extent and priority of the secured creditor's claim as well as representations or a stipulation as to the diminution of the value of such collateral during the course of the reorganization. While it is not always easy to precisely determine the value of the collateral, the priority of liens or to estimate potential decreases in the value of the collateral at an early stage of the case, the agreement must contain sufficient factual representations or stipulations to justify the adequate protection proposed.

None of the Agreements contain this requisite factual information either by stipulation or representation. The Inca–IRS and Gallegos Agreements bluntly state that the parties have neither the inclination nor the ability to determine these requisite facts. The Inca–Colorado Agreement contains no statement regarding the value of the cash collateral to be consumed, nor does it measure the value cushion which protects Colorado.

Based upon the information contained in the three Agreements, the adequate protection proposed is inappropriate.[1] In the Inca–IRS and Gallegos Agreements, the IRS admits that it is undersecured. As an undersecured creditor, the IRS is entitled only to protection of the value of the collateral backing its secured claim, but value is never disclosed. Yet, the Inca–IRS Agreement requires adequate protection both by a replacement lien in postpetition collateral in an unspecified amount and postpetition cash payments. A postpetition lien used to secure a prepetition unsecured indebtedness is impermissible[2]. To the extent that a lien on

---

1. This analysis is equally applicable to Colorado, also a secured party under the Gallegos Agreement.

2. *In the Matter of Saybrook Manufacturing Co.,* 963 F.2d 1490 (11th Cir.1992), the court concluded that cross collateralization in the context of postpetition financing is impermissible. It is

postpetition assets is sufficient to adequately protect the secured claim of the IRS, cash payments are unnecessary. As an undersecured creditor, the IRS is not entitled to any postpetition interest on its secured claim and the proposed application of cash payments to the prepetition unsecured debt is simply an impermissible payment to a preferred creditor.

■ Because under the Inca–Colorado Agreement, Colorado is admittedly oversecured, the proposed protection is overadequate. The debt owed to Colorado is $36,-988. Colorado claims it has a lien in all assets of the Debtor, but the Agreement does not value any collateral other than accounts receivable which are valued at $86,600. Although Colorado has agreed to a postpetition interest rate of 8 percent per annum, the value of the accounts receivable alone would provide cushion for the debt and compound interest for a period of ten years. As the Debtor proposed a Reorganization Plan prior to the submission of the Agreement to the Court, it hardly seems likely that the reorganization will be so long lasting. Even if the accounts receivable and other cash collateral were consumed, it is possible that Colorado would still have sufficient equity cushion in the remaining collateral to assure that its § 506(a) claim is fully satisfied. Given this level of security, the granting of a postpetition lien against all assets of the Debtor in an unspecified amount is unnecessary.

■ This Court also declines to approve these Agreements because each contains terms and conditions which exceed the nature and function of adequate protection. Instead they are designed to affect the course of the reorganization process and as a consequence may affect all creditors. This Court expresses no opinion as to whether such terms are permissible but because the rights of general unsecured creditors or the reorganization process may be substantially affected, all creditors should be provided with notice and an opportunity to object. Here, only limited notice was given pursuant to Fed.R.Bank.P. 4001.

The Agreements contain several terms which potentially affect the entire reorganization process. The Inca–IRS and Gallegos Agreements require that a significant portion of their provisions be incorporated into any proposed plan of reorganization. The Agreements provide that upon default the Secured Creditors would be allowed to *automatically* obtain relief from stay (to collect *both* pre and postpetition debts) or to have the case dismissed or converted. Contrary to the provisions of 11 U.S.C. § 363(f) the Agreements require payment in full to the Secured Creditors from the proceeds of any sale of the Debtor's business or its business assets. In the Inca–Colorado Agreement, if the case is dismissed and Inca refiles within 60 days, Inca is barred from opposing any motion by Colorado for relief from automatic stay.

When asked in the Inca case for legal authority supporting the enforceability of such terms, the IRS and Colorado offered none. Instead, they argued that these were "warning provisions" to impress upon the Debtor the seriousness of the default in its tax obligation. Colorado further argued that it did not intend to enforce the provisions applicable after dismissal.

■ Adequate protection, relief from stay and cash collateral agreements are not implements to be used to punish or threaten a debtor for its prepetition default nor are they vehicles to be used to overreach or control a debtor in the course of its reorganization. While secured creditors desire predictability and certainty during the reorganization process, a court must preserve the purpose and process of reorganization and protect creditors for a reasonable time during which the debtor restructures its debts. The protection for secured creditors during reorganization or liquidation is limited to rights provided by the Bankruptcy Code including relief from stay, adequate protection and reasonable conditions upon the use of cash collateral. Adequate protection and cash collateral agreements should be drawn to accomplish these limited purposes. If the

---

even more objectionable to allow cross collateralization where no new funds are advanced. Couched as adequate protection, the granting of

a postpetition lien to secure a prepetition unsecured debt impermissibly converts an unsecured debt to a secured one.

terms exceed adequate protection issues, all creditors are entitled to notice of such terms and an opportunity to object prior to a court's consideration of an agreement.

## V. CONCLUSION

For the foregoing reasons, it is therefore

**ORDERED** that the Motions to Approve the Inca–IRS Agreement, Inca–Colorado Agreement and Gallegos Agreement are **DENIED**.