### In re MEGAN–RACINE ASSOCIATES INC., Debtor.

**Bankruptcy No. 92–00860.**

United States Bankruptcy Court, N.D. New York.

Aug. 30, 1996.

Menter, Rudin & Trivelpiece, P.C., Syracuse, NY (Jeffrey Dove, of counsel), for Debtor.

Swidler & Berlin, Chartered, Washington, DC (Michael L. Shor, of counsel), for Niagara Mohawk.

House, Golden, Kingsmill & Riess, L.L.P., New Orleans, LA (Marguerite Kingsmill, of counsel), Bond, Schoeneck & King, L.L.P., Syracuse, NY (James Dati, of counsel), for Hudson Engineering.

Dewey Ballantine, New York City (Sandor E. Schick, of counsel), Hodgson, Russ, Andrews, Woods & Goodyear, Albany, NY, (Deborah L. Kelly, of counsel), for FDIC.

Melvin & Melvin, Syracuse, NY (Kenneth J. Bobrycki, of counsel), for TransCanada Gas.

Goldberg & Fabiano, Syracuse, NY, (Harold Goldberg, of counsel), for Creditors Committee.

Hancock & Estabrook, L.L.P., Syracuse, NY, (Charles J. Sullivan, of counsel), for Kraft.

Michael Collins, Assistant U.S. Trustee, Utica, NY.

### MEMORANDUM–DECISION, FINDINGS OF FACT CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Chief Judge.

The Court considers herein a portion of the motion filed by Megan–Racine Associates, Inc. ("Debtor") on July 15, 1996, seeking authorization for the use of cash collateral during the month of August, 1996, pursuant to § 363 of the Bankruptcy Code (11 U.S.C. §§ 101–1330) ("Code").

A preliminary hearing ("Hearing") was held at the Court's regular motion term on July 23, 1996, at Syracuse, New York. Objections to the Debtor's motion were filed on behalf of Niagara Mohawk Power Corporation ("NiMo") and Hudson Engineering Corporation ("Hudson") prior to the Hearing. Following oral argument, the Court provided the parties an opportunity to file memoranda of law on the limited issue of whether the Debtor should be authorized to make a monthly payment of $150,000 to the Federal Deposit Insurance Corporation ("FDIC"), in its capacity as Receiver of New Bank of New England N.A. ("NBNE"), as adequate protection for Debtor's continued use of FDIC's collateral. The matter was submitted for decision on July 30, 1996.[1]

### JURISDICTIONAL STATEMENT

The Court has core jurisdiction over the parties and subject matter of this contested matter pursuant to 28 U.S.C. §§ 1334(b), 157(a), (b)(1), (b)(2)(A) and (M).

### FACTS

In September 1989 Debtor entered into a financing agreement with NBNE in connection with the construction of a cogeneration plant in Canton, New York ("Facility"). NBNE ultimately agreed to loan the Debtor approximately $53,500,000.

On March 17, 1992, Debtor filed a voluntary petition ("Petition") seeking relief pursuant to Chapter 11 of the Code. Debtor has continued in the operation of its business and management of the Facility as a Debtor–in–Possession pursuant to Code §§ 1107 and 1108 for the past four years.

On September 16, 1992, the FDIC, as successor-in-interest to NBNE filed a proof of claim in the sum of $47,742,365.43. Historically, Debtor and the FDIC have entered into a stipulation for authorization of the use of cash collateral either on a monthly or quarterly basis, which has granted FDIC a roll-over post-petition security interest in

---

1. A final hearing on Debtor's motion was heard on August 6, 1995. An Order was signed by the Court on August 16, 1996, authorizing the use of cash collateral, except with respect to the $150,-000 payment to the FDIC.

Debtor's assets, as well as payments of adequate protection.[2]

On May 2, 1996, an explosion and fire occurred at the Facility, resulting in the cessation of Debtor's operations. In addition, on July 12, 1996, the Honorable Rosemary Pooler ("Judge Pooler"), United States District Judge for the Northern District of New York, issued a decision to the effect that the Debtor was not entitled to payments at the repealed statutory rate of $.06/kilowatt-hour for electricity sold to NiMo because of Debtor's failure to meet certain federal guidelines as a "qualified facility" ("QF") at the time the New York Public Service Law ("PSL") § 66© was amended in 1992. As a result of the decision, if the Debtor is able to recommence its operations, NiMo alleges that any electricity the Debtor generates and sells to NiMo will be at a tariff rate which is lower than the cost of natural gas the Debtor must purchase in order to generate the electricity.

At the final hearing on August 6, 1996, the Court approved the use of cash collateral to pay certain monthly expenses which Debtor alleged were necessary to maintain the Facility and prepare it for anticipated winter weather conditions. The Court reserved its decision with respect to the payment of $150,000 to the FDIC as adequate protection for said use.

### ARGUMENTS

Debtor contends that previous requests for authorization to use cash collateral focused on depreciation of the Debtor's assets, as well as the FDIC's alleged oversecured status. Debtor now makes the argument that since it is not generating any income, any use of cash on hand to maintain the operation of the Facility diminishes the value of cash collateral in which the FDIC has a security interest.

NiMo and Hudson assert that until the FDIC establishes the extent and priority of its lien, it is not entitled to adequate protection. They suggest that since the cash which the Debtor proposes to use ("soft collateral") is intended to maintain the physical plant and equipment ("hard collateral") in which FDIC has a security interest, FDIC should not be permitted to "double dip" by receiving a monthly payment of $150,000 in order for Debtor to be able to use FDIC's soft collateral to protect FDIC's hard collateral. They contend that since the Facility is not operating, there is no wear and tear on the hard collateral, and there is no new soft collateral being generated in the form of monthly income which requires protection. FDIC contends that as a result of the fire and explosion at the Facility, the value of its interest therein has declined even if the Debtor is able to collect under its insurance policies among other things because of deductibles the Debtor must meet. FDIC also argues that as a result of Judge Pooler's decision, the value of its monthly income stream in which it has an alleged security interest has declined and that the decision also had an impact on the value of the Power Purchase Agreement between the Debtor and NiMo in which FDIC contends it also has a security interest. Hudson contends that FDIC has already received adequate protection for any monies generated in the months prior to the Facility's shutdown. Both NiMo and Hudson propose that until the Court has made a final determination concerning the extent and priority of FDIC's security interest, the monies, namely $150,000 per month, should be deposited by the Debtor into an escrow account.

### DISCUSSION

■ Since the commencement of this case, the Court has granted the motions of the Debtor authorizing it to use cash collateral under the terms of various stipulations with the FDIC. Said relief has been granted while reserving the rights of other creditors such as Hudson and NiMo to object to any disbursements proposed by the Debtor in the future. NiMo and Hudson now contend that the Court should scrutinize any further payments to the FDIC of adequate protection in

---

**2.** From a review of the voluminous file in this case, it would appear that beginning with the projected budget for April 1993, FDIC has been receiving monthly payments of $150,000, identified in Debtor's budgets as adequate protection. Prior to April 1993 the amounts varied and allegedly included a deferred interest component.

light of the recent explosion and fire at the Facility and Judge Pooler's decision in July. It is those very events that the FDIC contends "only heighten the need of the FDIC to receive adequate protection ..." *See* Response of FDIC, dated July 30, 1996.

Code § 363(e) provides that upon request of an entity who has an interest in property sought to be used by a debtor-in-possession, the court shall condition or prohibit such use as is necessary to adequately protect that entity's interest. In this case, the Debtor and the FDIC have agreed that the FDIC should continue receiving monthly adequate protection payments of $150,000 in exchange for the Debtor's continued use of the Facility and cash collateral to maintain the Facility. Adequate protection which may be provided in the form of cash payment or periodic cash payments is intended to compensate a creditor for any decrease in the value of its security interest in collateral during the pendency of the debtor's reorganization that is due to the imposition of the automatic stay or is traceable to the use of such property. Code § 361(1); *In re Gallegos Research Group, Corp.*, 193 B.R. 577, 584 (Bankr.D.Colo.1995) (citing *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988)).

 "[T]o determine whether an entity is entitled to adequate protection and the type and the amount of adequate protection required, a court must determine the value of the collateral, the creditor's interest in the collateral and the extent to which that value will decrease during the course of the bankruptcy case." *Id.* In this case, there are two interests that must be considered separately and adequately protected, namely the FDIC's security interest in the hard assets, including the building and the equipment comprising the Facility, and its security interest in soft assets, namely the cash which Debtor currently has on hand which was generated prior to the explosion and fire in May (hereinafter "Collateral"). Hudson makes the argument that "Only the failure to apply cash to maintenance and upkeep of the Facility would justify payments to the FDIC, and lead to a decline in value which arguably

triggers the entitlement to adequate protection payments." *See* p. 4 of Supplemental Memorandum of Hudson, dated July 30, 1996. However, as NiMo correctly points out, it is the "total value of the creditor's interest which, ultimately, determines the entitlement to adequate protection." *See* p. 5 of Supplemental Objection of NiMo, dated July 30, 1996.

As noted by the court in *Gallegos*, an agreement for the use of cash collateral must present "a sufficient factual foundation upon which the creditors or the Court can determine whether and to what degree adequate protection is appropriate." *Id.* at 585. The agreement should "contain facts sufficient to establish the amount, extent and priority of the secured creditor's claim as well as representations or a stipulation as to the diminution of the value of such collateral during the course of the reorganization ... to justify the adequate protection proposed." *Id.*

 If, as the Debtor alleges, the FDIC is oversecured, it may not be entitled to either cash payments or postpetition liens. *See id.* at 584. Indeed, where there is a substantial value cushion there may be no need for additional protection. *Id.* In this case, neither the Court nor the creditors have been provided with sufficient factual information concerning the extent of the FDIC's lien and the value of the Collateral subject to it as of the date the case was commenced. What is important at this juncture in the case in any determination of additional adequate protection is the future stability of the value of the Collateral, rather than any particular level of value at any one time since the case was commenced. *See In re Dynaco Corp.*, 162 B.R. 389, 395 (Bankr. D.N.H.1993) (citing *In re T.H.B. Corp.*, 85 B.R. 192, 194 (Bankr.D.Mass.1988). As long as there was a continuous income stream being generated by the Debtor, the fact that the Debtor consumed a portion of those monies to operate and maintain the Facility each month did not diminish the value of the FDIC's interest in the Collateral. *See generally In re 499 W. Warren Street Associates, Ltd.*, 142 B.R. 53, 56–57 (Bankr.N.D.N.Y. 1992). FDIC retained its security interest in all future income and was adequately pro-

tected as a result as long as said income did not decline. *Id.* at 57; *see also In re Mullen,* 172 B.R. 473, 477 (Bankr.D.Mass.1994) (citations omitted) ("A receivable ... lender does not lack adequate protection, even if it is undersecured, so long as the value of the stream of future accounts or inventory and their proceeds is not declining."). Obviously, the Debtor experienced a decrease in its income stream in November 1995 as a result of NiMo's refusal to pay Debtor at a rate of $.06 per kilowatt hour and its escrowing of the difference between the $.06 rate and NiMo's tariff rate pending Judge Pooler's decision, which ultimately affirmed NiMo's right to withhold said monies. Also, with the interruption in its operations as a result of the fire and explosion, it is reasonable to assume that there was an additional decline in the value of the FDIC's interest in cash collateral below the level at which it existed when the Debtor filed its Petition.

Arguably, any decline in soft collateral also has a direct impact on the value of the hard collateral, namely the Facility. *See generally id.* at 478 (In discussing rents or receivable proceeds, the court noted that the value of accruing rents is an integral part of the real estate itself.) The preferential method for determining the value of income-producing property is the income capitalization approach. *In re Tipp Hill Associates,* Case No. 95–61390, slip op. at 11 (Bankr.N.D.N.Y. July 31, 1996). This approach to value is predicated on the assumption that there is a definite relationship between the amount of net income a property will earn and its value. There is no income being generated as long as the Debtor is not operating. Even if the Debtor is able to recommence its operations, the reasonable possibility exists that its income will be less than that generated at the commencement of the case based on the lower reimbursement rate for electricity sold to NiMo. This, in turn, will have a negative impact on the value of the FDIC's interest in the hard collateral as well.

Be that as it may, the Court simply does not have sufficient facts before it to determine whether additional monthly payments of $150,000 to the FDIC is appropriate in light of the recent events and the objections by NiMo and Hudson. Apparently, there is no dispute that the FDIC has a valid security interest in the Collateral. In addition, neither Hudson or NiMo appear to object to the FDIC receiving adequate protection in the form of a rollover lien on its Collateral. Whether or not the monthly payments of $150,000 to the FDIC is appropriate requires additional information. Pending the receipt of such information, which may require an evidentiary hearing, the Court concludes that until such time as a final determination is made by the Court, the payments should be escrowed by the Debtor, as suggested by Hudson and NiMo, beginning with the August 1996 payment which is the subject of this contested matter.

Based on the foregoing, it is hereby

ORDERED that Debtor's motion seeking approval of the use of cash collateral insofar as it requests authorization to pay the FDIC $150,000 in adequate protection for the month of August 1996 is denied without prejudice; and it is further

ORDERED that pending further order of this Court, Debtor shall escrow $150,000 on a monthly basis until such time as the Court is able to determine the appropriateness of the payment of adequate protection to the FDIC based on additional facts concerning the value of the Collateral at the time the Petition was filed and the extent of any decrease that has occurred and is likely to continue until confirmation.